557 F.2d 179
 In the Matter of COMBINED METALS REDUCTION COMPANY, Debtor
(ten cases).
Irving BENNETT, Appellant,
v.
Paul GEMMILL, Trustee, Appellee (four cases).
Irving BENNETT, Appellant,
v.
W. LaMonte ROBISON, Trustee, Appellee (four cases).
Irving BENNETT, Appellant,
v.
Paul GEMMILL, Trustee, Jeremiah Milbank, and Milbank & Co.,
Appellees.
Irving BENNETT, Entrada Industries, Inc. (Wasatch Chemical
Division), Charles A. Steen, Individually, Charles A. Steen,
as custodian for his sons and heirs, and Charles A. Steen on
behalf of the Steen Foundation, Appellants,
v.
Paul GEMMILL, Trustee, Appellee.
 Nos. 72-2755, 72-2882, 73-2155, 73-2330, 73-2907, 73-3143,
74-1298, 74-1606, 74-1776 and 74-2375.
 United States Court of Appeals,
Ninth Circuit.
 June 6, 1977.
As Amended July 12, 1977.
 
 D. Ray Owen, Jr., Salt Lake City, Utah, argued for appellant.
 William G. Fowler, Salt Lake City, Utah, argued for appellees.
 Appeal from the United States District Court for the District of Nevada.
 Before BROWNING and TRASK, Circuit Judges, and SWEIGERT,* District Judge.
 TRASK, Circuit Judge:
 
 
 1
 This proceeding is concerned with the financial frustrations of Combined Metals Reduction Company (CMRCO), a Utah corporation which was doing business principally in Utah and Nevada. Presently before us are ten separate appeals from orders of the District Court for the District of Nevada, regarding the reorganization of CMRCO pursuant to Chapter X of the Bankruptcy Act, 11 U.S.C. § 501 et seq.
 
 
 2
 CMRCO was organized October 5, 1923, as a Utah company with authorized capital stock of 4,000,000 shares. Currently, the corporation has 3,076,000 shares of common stock outstanding in the hands of 26 individuals. During most of its existence, CMRCO was principally engaged in the development of flotation processing for complex lead-zinc ores of the Pioche Mining District in the vicinity of Pioche, Nevada. By 1958 the company had acquired extensive mining properties in Nevada and Utah with a mill at Bauer, Utah with a capacity of 1,000 tons per day, and a mill at Caselton, Nevada with a capacity of 1,600 tons a day. More than 7,000,000 tons of ore had been milled through 1958, from which concentrate sales totaled $120,000,000 and net operating profit totaled $12,500,000. A drop in metal prices over a long period of time, together with a smelter strike which closed the smelters available to the venture, left the company with notes totaling $800,000 secured by mortgages and current liabilities exceeding current assets by over $130,000. A part of the operation was then shut down, but the portion remaining in operation failed to generate sufficient revenue to ease its financial burden. Creditors became aggressive and attachments of corporate assets resulted until June 25, 1968, when a receiver was appointed by the District Court for Nevada.
 
 
 3
 While CMRCO was in receivership, United States Smelting Refining & Mining Company (subsequently renamed U.V. Industries) made secured loans to CMRCO, taking mortgages on the concentrating mills and on a resin plant in Bauer, Utah. Subsequently, U.V. Industries attempted to foreclose on the properties and in order to block the foreclosures, an involuntary Chapter X petition was filed on September 30, 1970.[1] Paul Gemmill, who was acting as equity receiver, continued in that capacity until the petition was approved on February 3, 1971, when he was appointed trustee and W. LaMonte Robison, a certified public accountant, was appointed to assist the trustee in accounting matters.
 
 
 4
 At the beginning of the reorganization proceedings, CMRCO's books reflected assets having a book value of $2,525,574, and liabilities of $2,604,486, according to recitals in the amended reorganization plan proposed by the trustee in November 1972. However, the actual market value of CMRCO's assets was much higher. For example, the Caselton Mill had been fully depreciated on the books, but was estimated by the trustee to have an actual value of $2,500,000 as of November 1972. In March of 1973, the trustee estimated the fair market value of CMRCO's assets to be $5,408,250; according to the accountant, CMRCO's liabilities at that time totaled only $2,715,169. Thus, there is no question as to CMRCO's solvency; its only problem was an inability to meet current liabilities.
 
 
 5
 The reorganization presently before us has proceeded in general accordance with the provisions of Chapter X. The district judge did not refer the matter to a bankruptcy judge, electing to retain control of the matter personally.[2] During the course of the Chapter X proceedings, several plans of reorganization were proposed by the trustee; however, the first three plans were either rejected by the creditors or withdrawn. On November 22, 1972, the trustee's fourth plan was submitted for the district court's approval, which was granted in an order dated and entered March 19, 1973. Basically, the plan provided for the orderly liquidation of an unspecified portion of the debtor's assets, in order to raise sufficient funds to pay all creditors in full, together with all allowable administrative expenses. The plan also set forth the priority of creditors, dividing them into six classes, and providing for their payment in strict accordance with that priority. The remaining assets were then to be turned over to the shareholders. Creditor and shareholder approval was solicited by the trustee. While a majority of the shareholders accepted the plan, two classes of creditors did not. Concluding that creditor acceptance from these two classes was unnecessary, due to the nature of the plan which provided for their payment in full, the district court confirmed the plan in an order signed June 4, 1973. (Appeal No. 73-2155, C.T. at 2379).
 
 
 6
 Prior to the court's confirmation of the plan, the trustee sought and obtained the court's permission to sell a certain parcel of real estate in Colorado. Pursuant to the court's order permitting the sale, the trustee sold the property. On the same day as the reorganization plan was confirmed, the district court also approved leases, options and sales respecting three additional parcels of real property. Subsequently, other transactions disposing of the debtor's property were approved or confirmed by the district court. In all cases, a noticed hearing was held prior to the court's approval and confirmation of the particular transaction, and in every case except one, the trustee proceeded to dispose of the various properties in accord with the district court's orders.[3] The funds thereby obtained were disbursed to creditors or utilized for administrative expenses.
 
 
 7
 The procedural history of this case is rather complex as at least twenty appeals have been filed challenging the actions of the trustee since the initiation of the Chapter X proceedings. U.V. Industries and United States Fuel Company brought a number of separate appeals against the trustee (Paul Gemmill or his replacement, W. LaMonte Robison), as well as joining several of the appeals presently before us. Pursuant to a stipulation of voluntary dismissal, this court dismissed U.V. Industries and United States Fuel as co-parties with Irving Bennett (see infra ) to Appeals No. 73-2155, 73-2330, and 73-2907, and dismissed altogether Appeals No. 71-2176, 71-2220, 71-2221, 71-2992, 73-3144, 74-1303, 74-1304, and 74-1605, as to which U.V. Industries and United States Fuel were the only appellants.
 
 
 8
 Except for one party who has not filed briefs, the sole proponent of the ten appeals presently under consideration is Irving Bennett, a minor shareholder and creditor.[4] His appeals were argued to this panel on November 14, 1975; however, submission of the case was deferred pending disposition of a motion made by the trustee shortly before oral argument. The motion urged that eight of the appeals should be dismissed as moot. We have decided to resolve all of the issues involved in this case in one opinion. We will first dispose of the questions raised by the motion to dismiss, and will then reach the merits of the issues that remain viable, concluding with the two appeals unaffected by the trustee's motion.
 
 THE MOOTNESS QUESTION
 
 9
 The basis for the trustee's motion is that the trustee has taken irreversible steps pursuant to the district court's orders. Those steps consist of sales, leases, options and other transactions of similar character. Because of those actions, argues the trustee, this court cannot render any effective relief to the appellant even if the appeals were decided in his favor. In broad terms appellee's contentions of mootness seem to be well founded and must be considered. The appeals having to do with these property dispositions are as follows:
 
 
 10
 1) Appeal No. 72-2755, from an order entered June 29, 1972, approving the trustee's settlement of a claim filed by David L. Gemmill, brother of the trustee;
 
 
 11
 2) Appeal No. 73-2155, from orders entered June 5, 1973:
 
 
 12
 i. Confirming the amended plan of reorganization;
 
 
 13
 ii. Approving and confirming a lease and option of the Lone Mountain mining property in Eureka County, Nevada;
 
 
 14
 iii. Authorizing the trustee to sell a resin processing plant at Bauer, Utah;
 
 
 15
 iv. Authorizing an option agreement respecting the sale of iron manganese tailings at Caselton, Nevada;
 
 
 16
 3) Appeal No. 73-2330, from an order entered March 19, 1973, authorizing the sale of the debtor's interest in real property located in Gunnison County, Colorado (also known as the "Crested-Butte property");
 
 
 17
 4) Appeal No. 73-2907, from orders entered August 1, 1973:
 
 
 18
 i. Authorizing the trustee to sell various parcels of real property located in Lincoln County, Nevada; and
 
 
 19
 ii. Authorizing the trustee to sell real property located at Bauer, Utah;5) Appeal No. 73-3143, from an order entered August 29, 1973, approving and confirming a lease of the debtor's Caselton Mill facilities in Lincoln County, Nevada;
 
 
 20
 6) Appeal No. 74-1298, from orders entered October 24, 1973 and November 8, 1973:
 
 
 21
 i. Confirming the sales of various parcels of real property located in Lincoln County, Nevada; and
 
 
 22
 ii. Approving and confirming a lease and option agreement regarding property located in Tooele County, Utah (known as the "Mercur Gold property");
 
 
 23
 7) Appeal No. 74-1776, from an order dated May 7, 1974, approving a lease agreement respecting the Caselton Mine and related properties, located in Lincoln County, Nevada, and authorizing the sale of miscellaneous items of personal property;
 
 
 24
 8) Appeal No. 74-2375, from an order entered June 20, 1974, approving and confirming the sale of real property, mill, and facilities located in Bauer, Utah, and approving leases and options affecting adjacent mining claims and the tailings pond.
 
 
 25
 In all of the above-listed appeals, the appellant is seeking reversal by this Court of each order from which he has appealed. In addition, in some of the appeals (Appeals No. 72-2755, 73-2155, 73-2330, 73-2907, 73-3143, and 74-1298) he wants us to order that the trustee reacquire the property or that the property be restored to CMRCO. For purposes of the motion to dismiss for mootness, we will consider the applicable law, the appellant's arguments contra, and certain problems with regard to particular appeals.
 
 A. Applicable Law
 
 26
 Generally an appeal will be dismissed as moot when events occur which prevent the appellate court from granting any effective relief, even if the dispute is decided in favor of the appellant. In the words of the Supreme Court:
 
 
 27
 "The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it. It necessarily follows that when, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of the plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal." Mills v. Green, 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895).
 
 
 28
 Similarly, in Fink v. Continental Foundry & Machine Co., 240 F.2d 369, 374 (7th Cir. 1957), cert. denied, 354 U.S. 938, 77 S.Ct. 1401, 1 L.Ed.2d 1538 (1957), the court of appeals stated the rule:
 
 
 29
 "(I)f pending an appeal an event occurs which renders it impossible for the appellate court to grant any relief or renders a decision unnecessary the appeal will be dismissed."
 
 
 30
 In this case, the trustee has sold or leased the various properties during the pendency of the appeals, in accordance with the authority granted him by the district court. Utilizing the rule of Mills, supra, the trustee argues that these appeals should be dismissed as moot because this court cannot grant the relief sought by the appellant. Specifically, since the sales, leases and options have long since been consummated, the trustee contends that a reversal of the various district court orders would be ineffective to undo what has already been done. Since the appellant did not obtain stays of the district court orders, pending the outcome of his appeals, the trustee argues that he was justified in acting in accordance with those orders, and that his actions are now irreversible. According to the trustee, Bennett is therefore left without any effective remedy, and as a result, his appeals are now moot.
 
 
 31
 In 1946, the Fourth Circuit had occasion to consider a similar motion to dismiss by reorganization trustees, in Taylor v. Austrian, 154 F.2d 107 (4th Cir. 1946) (per curiam). The fact situation there was very close to that of the present case, although in Taylor only one sale was involved:
 
 
 32
 "This appeal was taken from an order of the District Court issued on December 10, 1945 wherein the trustees for the Central States Electric Corporation, a debtor in reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., were authorized to sell certain securities in the debtor's portfolio in order to accomplish a saving of income taxes. The Committee for Holders of 7% Cumulative Preferred Stock of the debtor noted an appeal from this order on December 17, 1945, but failed to take any steps to stay the operation and effect of the order; and the trustees proceeded to make the sales and completed them by December 29, 1945." 154 F.2d at 108.
 
 
 33
 The trustees then moved the court of appeals to dismiss the appeal on grounds of mootness. The court granted the motion, concluding that there was no matter before it which it had authority to decide.
 
 
 34
 The opinion of the district court in the case of In re Lewis Jones, Inc., 369 F.Supp. 111 (E.D.Pa.1973), a bankruptcy case involving a fact situation somewhat similar to the present case, is also relevant. In that case a creditor claimed an interest in an escrow fund belonging to the bankrupt corporation; the bankruptcy court and the district court both disagreed. The creditor appealed, but did not obtain a stay. During the pendency of the appeal, the bankruptcy judge entered an order approving the sale of all assets of the corporation, including its interest in the escrow fund. The sale was consummated, following which the creditor petitioned the district court to enjoin disbursements from the escrow fund pending the outcome of its appeal. The court denied the injunction, stating:
 
 
 35
 "It is clear that a party seeking to avoid any impairment in its ability to realize the benefit of a successful appeal relating to the disposition of a subsidiary portion of the proceedings before the Court must seek to stay the progress of the proceedings by obtaining a stay or injunction pending appeal. Absent the grant of a stay or injunction and the approval of a bond, the status quo of the litigation is not fixed and the litigation is free to continue. Thus a party who chooses to appeal but who fails to obtain a stay or injunction pending appeal risks losing its ability to realize the benefit of a successful appeal." 369 F.Supp. at 115-16.
 
 
 36
 The holdings in Taylor and Lewis Jones are clearly in accord with the position argued by the trustee in support of his motion to dismiss for mootness. In addition, there are other lines of authority which we find persuasive. Of particular help is the rule regarding an appeal to a district court from orders of a bankruptcy judge. In the words of the Fourth Circuit:
 
 
 37
 "It is settled law that the filing of a petition to review an order of a bankruptcy judge (formerly a referee in bankruptcy), does not stay the effect or operation of the order unless a supersedeas bond is filed or the order itself provides for a stay." In re Abingdon Realty Corp., 530 F.2d 588, 589 (4th Cir. 1976).
 
 
 38
 In accord is recently-adopted Bankruptcy Rule 10-801(2), which applies only to appeals to the district court from orders of bankruptcy judges in reorganization proceedings.[5] Clearly, this rule and the doctrine stated by the court in Abingdon Realty, supra, are not directly controlling in this case, since they only apply to appeals made to the district court. However, we see no reason why the result should be any different for an appeal to this Court. In both cases, the practical necessities involved in a successful reorganization require that unless an order of the bankruptcy judge or the district judge is stayed pending appeal, the trustee's acts in accordance with that order should not thereafter be subject to reversal, even if the order is subsequently overturned on appeal.
 
 
 39
 We are also mindful of a line of cases dealing with appeals from denials of injunctions. While not directly on point, these cases stand for the proposition that where an act or event sought to be enjoined has been performed or has occurred, an appeal from the denial of the injunction will be dismissed as moot. The following language is typical:
 
 
 40
 "It is well-settled that the mere filing of an appeal, in the absence of a stay of proceedings, cannot operate as an injunction where none has been granted by the court below; otherwise stated, an appeal from a decree dismissing a complaint seeking an injunction, or refusing to grant an injunction, will not disturb the operative effect of such a decree, and where the act sought to be restrained has been performed, the appellate courts will deny review on the ground of mootness." Brill v. General Ind. Enterprises, 234 F.2d 465, 469 (3d Cir. 1956).
 
 
 41
 In accord is Sawyer v. Pioneer Mill Co., 300 F.2d 200 (9th Cir. 1962) (en banc), cert. denied, 371 U.S. 814, 83 S.Ct. 24, 9 L.Ed.2d 55 (1962), which involved an action to prevent the use at a shareholder meeting of proxies solicited by an allegedly misleading proxy statement. In that case, we held that the appeal was rendered moot by the fact that the meeting was held and the proxies used to approve a merger:
 
 
 42
 "In short, since the purpose was to prevent the meeting, or the use of the proxies at the meeting, since both of those things have happened, and since the present action is not an appropriate vehicle for an attack upon the merger, the action has become moot." 300 F.2d at 202.
 
 
 43
 Accord, Fink v. Continental Foundry & Machine Co., 240 F.2d 369 (7th Cir. 1957); Sobel v. Whittier Corp., 195 F.2d 361 (6th Cir. 1952). The appellant here wants this Court to reverse the orders authorizing the sales and leases, but he does not per se seek to have the transactions set aside. In order to obtain the latter relief, he would be required to bring a new action and join the buyers and lessees as parties. Just as in Sawyer, the present appeals are not the proper means of attacking the specific acts that have apparently mooted the appeals.
 
 B. Appellant's Arguments
 
 44
 In opposition to the motion to dismiss, the appellant presents two major arguments. One is based on the notion that an appeal cannot be rendered moot by the voluntary act of the appellee; since the trustee was the one who sold or leased or optioned the properties, and thereby set the stage for the present motion to dismiss, the appeal should not be dismissed as moot. This argument ignores the essential fact that all of the actions of the trustee were based on orders of the district court, orders which the trustee was not free to disregard.[6] In essence, then, the trustee's acts were not " voluntary," since he was required to perform them.
 
 
 45
 In Fink v. Continental Foundry & Machine Co., 240 F.2d 369 (7th Cir. 1957), the court was faced with a somewhat similar argument. In that case the appellants were seeking to enjoin a sale of corporate assets, which sale took place immediately after the action for an injunction was dismissed by the lower court. The appeal, which was filed after the sale, was subsequently dismissed as moot, since it was impossible for the court of appeals to restore the status quo. The court quoted the Mills rule regarding mootness, and noted particularly that the Supreme Court had qualified the rule by requiring that the event which moots the appeal must be "without any fault of the defendant." 240 F.2d at 375. The appellate court then held that although the sale had occurred as a result of the appellee's action, there was no "fault" involved:
 
 
 46
 "It is true that it was by the act of Continental that the assets were transferred out of the jurisdiction of the court and the liquidation accomplished but Continental did only that which it had a right to do. . . . After the case had been tried on its merits and permanent injunction denied with dismissal of the complaint for want of merit Continental was free of restraint. If plaintiffs desired that the status quo be maintained pending appeal means were afforded in proper case by Rule 62, F.R.C.P., as heretofore pointed out. Plaintiffs failed to seek such protection. The appeal was not taken until twelve days after the judgment and then no stay was sought. In the meantime the assets of Continental had passed from the court's jurisdiction by the act of Continental without fault on its part." 240 F.2d at 375.
 
 
 47
 This language is dispositive of the appellant's first argument. The trustee here acted only as the district judge authorized him to act; absent a stay of the court's orders, the trustee cannot be faulted for disposing of the various properties in accordance with those orders. The burden of obtaining stays of the district court's orders was on the appellant, and in view of the well-established rule that an appeal will not affect the validity of a judgment or order during the pendency of the appeal, absent a stay or supersedeas, we have no difficulty in rejecting appellant's first argument.
 
 
 48
 Appellant's second contention is that some exception to the general mootness rule is applicable, and will save his appeals. He argues several exceptions that there is a continuing dispute which should be resolved, that there is some public interest which justifies consideration of the merits, and that there is a controversy which is capable of repetition, but which will evade review. We find none of these exceptions applicable.
 
 
 49
 With regard to the "continuing dispute" exception, appellant argues, in essence, that his deep-seated disagreement with the manner in which the reorganization proceedings have been handled is sufficient to justify a characterization of the dispute as "continuing," and thus to remove the case from the general mootness rule. However, as to the challenged orders regarding the trustee's sales, leases, and options, the dispute is ended. Even if the district court's orders were to be reversed, the property transfers would still be valid and final. Those transfers simply cannot be voided or rescinded by us in this proceeding, where the purchasers, lessees, and optionees are not parties, and where the transactions have been consummated by the trustee. In addition, there is no possibility that the trustee will dispose of these same properties again, pursuant to the same district court orders. If the appellant wishes to appeal additional orders of the district court, he may do so; but the mere possibility of such appeals does not make the dispute "continuing" so as to justify consideration of the merits in spite of the mootness rule.
 
 
 50
 Appellant's argument that the controversy is capable of repetition but will always evade review is based on the rule promulgated in Southern Pacific Terminal Company v. I.C.C., 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911), and Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). However, this simply is not a proper case for application of the doctrine. The only reason why these appeals will evade review is because the appellant did not obtain stays of the district court's orders. As noted in Lewis Jones, supra, "a party who chooses to appeal but who fails to obtain a stay or injunction pending appeal risks losing its ability to realize the benefit of a successful appeal." (369 F.Supp. at 116). It is the fault of the appellant that the merits of these disputes will not be considered, and he simply does not qualify for the exception. Furthermore, where the appellee has sold and the court approved the sale of a specific parcel of real property, the transaction is not capable of repetition. In this case, the buyers and lessees are not charged with improper dealing and are not even before this court.
 
 
 51
 Finally, appellant's arguments concerning the public interest nature of this controversy are not persuasive. Even if such an exception exists in federal courts, which is questionable after DeFunis v. Odegaard, 416 U.S. 312, 316, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), we do not see how these appeals present any kind of public interest question that would justify our consideration of moot issues. Furthermore, a "court will not decide a moot case on the sole ground of public importance." Alton & So. Ry. Co. v. International Ass'n of Mach. and Aerospace Workers, 150 U.S.App.D.C. 36, 463 F.2d 872, 880 (1972), citing Amalgamated Ass'n of Street etc. Employees Div. 998 v. Wisconsin Emp. Rel. Bd., 340 U.S. 416, 71 S.Ct. 373, 95 L.Ed. 389 (1951).
 
 
 52
 In short, we reject all of the appellant's arguments against the trustee's motion to dismiss the property appeals for mootness. None of the exceptions to the mootness doctrine are applicable, and in view of the fact that the trustee only acted to implement the district court's orders, we see no reason why his conduct should preclude a conclusion of mootness.
 
 
 53
 C. Appellant's Motions for Stay and Supersedeas
 
 
 54
 Despite our general agreement with the merits of the trustee's motion, there is one aspect of the motion which requires further consideration. A dismissal for mootness would be premised on the fact that the appellant did not obtain stays of the district court's orders. However, the appellant did seek stays from the district court of seven of the orders now under consideration. Without exception, the district judge denied the appellant's applications, and the appellant did not thereafter seek stays from this Court.[7]
 
 
 55
 The first order which the appellant attempted to stay was an order entered on March 19, 1973, authorizing the sale of CMRCO's interest in the Crested Butte property in Gunnison County, Colorado.[8] On March 23, 1973, Bennett, U.V. Industries, and several other parties filed a notice of appeal and an application for stay of the court's order, representing that a supersedeas bond of $5,000 should be fixed as security.[9] However, as of March 23, 1973, the trustee had already delivered the deed to the purchaser and was momentarily expecting receipt of the purchase price. The judge calendared the matter for April 27, 1973, but he specifically refused to grant a temporary stay pending his decision on the application. When he finally did rule, he denied the stay because of mootness, since the sale had by that time already been completed.
 
 
 56
 In view of the fact that the basis for the trustee's motion to dismiss is the failure of the appellant to obtain a stay, we are somewhat disturbed by the lower court's cavalier treatment of the appellant's application for the stay which would have preserved his appeal.
 
 
 57
 In arguing that the order should be stayed, the appellant suggested that pursuant to Fed.R.Civ.P. 62(a), the trustee should have waited for ten days before completing the sale. Fed.R.Civ.P. 62(a) provides in part:
 
 
 58
 "Except as stated herein, no execution shall issue upon a judgment nor shall proceedings be taken for its enforcement until the expiration of 10 days after its entry. Unless otherwise ordered by the court, an interlocutory or final judgment in an action for an injunction or in a receivership action, or a judgment or order directing an accounting in an action for infringement of letters patent, shall not be stayed during the period after its entry and until an appeal is taken or during the pendency of an appeal."
 
 
 59
 In opposing the appellant's application for stay, the trustee argued that a Chapter X reorganization is analogous to an equity receivership, and that the exception in the Rule for a receivership should apply to reorganizations. (C.T. at 2243). He also argued that the mandatory application of Fed.R.Civ.P. 62(a) was contrary to "the proposition and intention of Chapter X," and that, therefore, the automatic stay provision should not apply. (C.T. at 2244-45). The district court, while not stating any reasons for its decision, concluded that Fed.R.Civ.P. 62(a) was inapplicable "to orders of a district court sitting in bankruptcy and relating to sales of property of the debtor." (C.T. at 2323). 2A Collier on Bankruptcy 14th ed., P 25.12, pp. 957-59 (1976) is to the contrary, as is U.S. Manufacturers Equip. Company v. Rugh, 29 F.Supp. 40 (W.D.Pa.1939).
 
 
 60
 The problem, insofar as the motion to dismiss for mootness is concerned, is whether there is any effective relief that we could grant, if we were to determine that the district court erred in not recognizing the applicability of Fed.R.Civ.P. 62(a). As has been noted above, we cannot reverse or void the sale; it was completed in accordance with a valid order of the district court and the purchaser is not a party to this appeal. Even if the trustee's consummation of the sale was violative of the rule, it is clear from the reporter's transcript for March 23, 1973, that the responsibility for the violation lies with the district judge; knowing on that day that he could stay the order and restore the status quo, he refused to do so pending argument of the motion for stay, which he calendared for April 27, a date well beyond the automatic stay period. In essence, he indicated to the trustee that the sale could be completed immediately, which it was.
 
 
 61
 We have previously suggested that most of Bennett's appeals may be moot, because he did not obtain stays of the court's orders. Now, in this particular appeal, the appellant applied for a stay in a timely manner, and his motion was denied because the sale had already been completed and his motion was moot. It is certainly arguable that Fed.R.Civ.P. 62(a) does apply in this kind of situation. However, as a result of the consummation of the sale, it appears that we are powerless to do anything more than simply point out the circumstances of the district court's ruling. Furthermore, appellant Bennett did not appeal from the court's denial of his application, so that, strictly speaking, that issue is not even before us.
 
 
 62
 Given the trial court's ruling, the transfer of title and the failure to join the transferees as parties, it would appear that this court cannot at this time restore the status quo or grant any relief, even if the district court did err in not applying Fed.R.Civ.P. 62(a). We therefore will not rule on the issue of whether the automatic stay provision of the rule is applicable to Chapter X proceedings; any such decision on our part would be in effect an advisory opinion. We are not prepared to say what success the appellant might have obtained had he promptly sought relief of some kind in this court, or had he attempted to have the sale set aside in a separate action.
 
 
 63
 Appellant Bennett also applied for stays of the four orders signed on June 4, 1973 (presently the subject of Appeal No. 73-2155), and the two orders entered on August 1, 1973 (presently the subject of Appeal No. 73-2907). However, the application specifically requested that no supersedeas bond should be required. (C.T. at 2444). Under Fed.R.Civ.P. 62(d), an appellant may obtain a stay as a matter of right by posting a supersedeas bond acceptable to the court. Since no bond was posted, the grant or denial of the stays was a matter strictly within the judge's discretion. He chose to deny the appellant's application, and we cannot say that he abused his discretion in so deciding. In addition, we have no record of any appeals to this court from the judge's denial of the application; thus, the matter is not properly before us. While it is possible that a violation of the ten-day automatic stay provision of Fed.R.Civ.P. 62(a) occurred, we will not consider that issue, for the same reasons stated above.
 
 
 64
 D. Effect of This Court's Stay of Order in Appeal No. 73-2907
 
 
 65
 We have previously been discussing the property appeals as if all of the orders being appealed had long since been implemented. There is one exception, one order which never was, and never will be, carried out. This is the order entered August 1, 1973, authorizing the trustee to sell certain real property in Bauer, Utah. In October 1973, U.V. Industries applied to this Court for a stay of that order, which we granted on October 9, 1973. Because of that stay, the trustee did not at that time sell the property, and the order now appealed in Appeal No. 73-2907, was not implemented.
 
 
 66
 However, the appeal of this order is nonetheless moot, because the trustee subsequently sold the subject property in another transaction, to another buyer. In an order entered June 20, 1974 (now challenged in Appeal No. 74-2375), the trustee was authorized to sell 2240 acres in Bauer, Utah. Part of this property was the land covered by the order which this Court stayed in October 1973. As a result of this latter conveyance, which was not stayed, there is no possibility that the transaction authorized by the 1973 order will ever take place, since CMRCO no longer owns the land. Therefore, this part of Appeal No. 73-2907 is moot. Even if we were to decide the merits of the appeal our decision would have no effect on the sale of the property, since the purchaser is not a party to this litigation.
 
 
 67
 The only way that Appeal No. 73-2907 might not be moot is if we were to decide that our stay of October 1973, blocked the trustee from selling the property during the pendency of the appeal. Upon examining the language of our order,[10] it is clear that the sale of the property was not stayed, but only the order authorizing the sale. Hence, the court still had the power to issue a new order authorizing the sale of the property to a different purchaser, and upon different terms. Our stay was not violated, and Appeal No. 73-2907 is as moot as all of the other property appeals.
 
 
 68
 E. Other Issues Involving the Motion to Dismiss
 
 
 69
 Two of the eight appeals subject to the trustee's motion to dismiss for mootness contain issues unrelated to the trustee's sale of property pursuant to the district court's orders. One such issue, present in Appeal No. 72-2755, involves the propriety of the district court's approval of a compromise respecting a claim against the debtor filed in 1968 by one David Gemmill. The essence of the appellant's challenge to the compromise is that David Gemmill is the brother of Paul Gemmill, who was the reorganization trustee at the time of the settlement, and the receiver for the debtor corporation at the time when David Gemmill filed his claim.
 
 
 70
 David Gemmill's claim was based on a complex transaction which occurred in 1951; details of the transaction will be set out infra. At first, Paul Gemmill objected to the claim, and his attorney wrote a detailed memorandum in support of his objections to the claim. However, after the Chapter X proceeding was initiated, Paul Gemmill, as reorganization trustee, entered into a stipulation and proposed settlement of the claim. The compromise provided for David Gemmill to receive certain stock in exchange for dropping his claim. The district court approved the settlement, and it was thereafter implemented. David Gemmill has since died.
 
 
 71
 It appears that the trustee's transfer of the stock, pursuant to the court's order approving the settlement, is sufficient to moot the appeal insofar as the power of this court to order rescission of the settlement is concerned. Since David Gemmill (or his successor in interest) is not a party to this appeal, and since the settlement has been implemented, there is simply no way that we could order restoration of the status quo. Therefore, we do not consider the merits of the compromise itself.
 
 
 72
 However, in addition to asking that the district court's order approving the compromise be reversed, Bennett in this particular appeal also prays that the trustee be surcharged for the value of the stock given up by CMRCO as part of the compromise. In essence, Bennett is arguing that the trustee breached his fiduciary duty, and is requesting that the trustee be held personally liable for the loss to CMRCO resulting from the compromise. It is Bennett's contention that David Gemmill's claim was completely meritless, and that the trustee therefore gave up valuable property (the stock) in exchange for David Gemmill dropping a worthless claim.
 
 
 73
 Generally, equity courts have the power to hold a trustee personally liable for losses occasioned by a breach of his trust. Mosser v. Darrow, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951); In re Imperial "400" National, Inc., 456 F.2d 926 (3rd Cir. 1972). Surcharging the trustee thus appears to be a feasible remedy, and therefore, this aspect of the appeal merits our consideration.[11] We will return to this issue after we have completely disposed of the motion to dismiss.
 
 
 74
 The other appeal which involves an issue not directly related to a sale of property by the trustee is Appeal No. 73-2155. One of the orders therein appealed is the order confirming the plan of reorganization.[12] Although the appellant did not obtain a stay of that order, this issue differs from the other appeals covered by the trustee's motion to dismiss. If we were to conclude that the appellant is correct, and that the plan was erroneously confirmed by the district judge, then a decision to that effect could have some effect on the proceedings below. While much of the debtor's property has been liquidated, and many of the creditors have been paid, the plan still controls the actions of the trustee. In addition, if the district court's order were reversed, the debtor corporation might be forced into bankruptcy, under § 236 of the Bankruptcy Act (11 U.S.C. § 636), which apparently is in accord with the appellant's wishes. As a result, we are of the opinion that the appeal of the order of confirmation is not moot, and we will consider the merits of this issue below.
 
 F. Disposition of the Motion
 
 75
 Based on the above analysis, we grant the trustee's motion to dismiss Appeals No. 73-2330, 73-2907, 73-3143, 74-1298, 74-1776, and 74-2375. The motion to dismiss as to mootness is granted as to Appeals No. 72-2755 and 73-2155, except for the issue of the trustee's personal liability for a possible breach of trust (Appeal No. 72-2755) and the issue of the court's confirmation of the plan of reorganization (Appeal No. 73-2155).
 
 APPEAL NO. 72-2755
 
 76
 Appeal No. 72-2755, regarding the trustee's compromise of his brother's claim, presents probably the most difficult issue of this entire case. As noted above, this compromise arose out of a claim against CMRCO filed by David Gemmill, the brother of the trustee. The claim was based on a 1951 purchase of stock by CMRCO from David Gemmill. The stock involved all of the outstanding shares of Comet Mines, a Nevada corporation whose assets consisted of 26 unpatented mining claims. CMRCO agreed to pay $16,850 in cash to David Gemmill personally, and to cancel two obligations owed to CMRCO by Comet Mines, and guaranteed by David Gemmill, in the amount of $3,205.87 and $3,023.26. In addition, CMRCO agreed to pay a percentage "out of net smelter and mill returns on ores extracted and marketed . . . from the property," until Prince Consolidated Mining Co. (owned in substantial part by David Gemmill) received $10,000, and until David Gemmill received $60,620.87. (Appeal No. 72-2755, C.T. at 17). The total of the amounts owed by CMRCO, after paying the cash and cancelling the two obligations, was stated to represent a portion of the obligation of Comet Mines to David Gemmill "for advances heretofore made by him." (Id.)
 
 
 77
 Subsequently, the terms of the selling price were modified by David Gemmill and CMRCO, so that the obligation to Prince Consolidated Mining Company was increased to $17,466.88, and the debt to David Gemmill was decreased to $52,572.88. (Appeal No. 72-2755, at 19). The new amount owed to Prince represented obligations of David Gemmill to Prince. The net effect of this 1952 modification was negligible from the view of CMRCO, since the total sum owed on the purchase of the Comet Mines stock only decreased by a few hundred dollars, to $70,039.56. No payments were ever made by CMRCO to reduce this total, and the property never produced any marketable amounts of ore. So far as can be determined from the record, David Gemmill never made any claim against CMRCO until after receivership proceedings were initiated in 1968 seventeen years later.
 
 
 78
 Shortly after Paul Gemmill was appointed receiver for CMRCO in 1968, David Gemmill filed his claim for the full amount owed to him and to Prince, $70,039.56, plus interest from 1951. Eventually, after the reorganization proceedings had been instituted, the claim was compromised; the settlement provided that all of the shares of Comet Mines would be returned to David Gemmill, and that Comet Mines would pay to CMRCO a percentage of its net smelter returns (i. e., a royalty), up to $30,000, for funds expended by CMRCO in attempting to develop the property. In essence then, the 1951 sale of the Comet Mines stock was rescinded, except that David Gemmill was not required to return the $23,089.13 consideration (cash and forgiven obligations) which he had previously received.
 
 
 79
 As we have already discussed, we cannot restore the status quo, and there is thus no reason for us to consider the merits of the compromise per se. However, if Paul Gemmill is held to have breached his fiduciary duty as trustee, then we could surcharge him for any losses to CMRCO resulting from his wrongdoing. The appellant strongly contends that the conflict of interest, caused by the fraternal relationship between the trustee and David Gemmill, tainted the compromise. Bennett cites §§ 156 and 158 of the Bankruptcy Act (11 U.S.C. §§ 556, 558) in support of his challenge to the propriety of the compromise, and it appears that the trustee might have been in technical violation of these sections. Section 156 requires that a trustee must be "disinterested;" § 158(4) defines "disinterested" to exclude any person if "it appears that he has . . . for any reason an interest materially adverse to the interests of any class of creditors or stockholders." Arguably this language would include a trustee whose brother is a creditor of the debtor corporation.
 
 
 80
 The district judge was well aware of the relationship between the trustee and David Gemmill. He observed at the hearing on the settlement:
 
 
 81
 "Although David Gemmill is the brother of Trustee Paul Gemmill, this Court is satisfied that Mr. Paul Gemmill, to the extent that he's dealt with his brother in this regard, has done so at arm's length, and that David Gemmill has gained absolutely no advantage because of his relationship to the Trustee, Paul Gemmill.
 
 
 82
 "This court has throughout these proceedings and the equity proceedings that took place prior to the Chapter X proceedings, expressed and continues to express its full confidence in the integrity, competence and judgment of Mr. Paul Gemmill, particularly as a mining engineer, and wholly familiar with the debtor's property." (R.T. June 15, 1972, at 27).
 
 
 83
 We are not completely convinced that David Gemmill "gained absolutely no advantage because of his relationship to the Trustee." We note in particular that although the compromise was in effect a rescission of the 1951 sale, David Gemmill was not required to restore to CMRCO the $23,089.13 consideration which he had previously received. This aspect of the compromise is especially interesting in view of the fact that in his claim, one of David Gemmill's arguments was that the original agreement should be rescinded because of an alleged breach of the agreement by CMRCO. Rescission of course would normally require a return of all consideration by both sides. In addition, we are struck by the fact that CMRCO's books reflected an investment in Comet Mines of $157,000, by the fact that Paul Gemmill was the only witness who testified as to the value of the property owned by Comet Mines, and by the fact that David Gemmill received satisfaction of his claim long before any other creditor, including those with secured claims. While we express no opinion as to the effect of these aspects of the compromise, we do feel that they should be noted.
 
 
 84
 It is well established that a trustee in a reorganization is required to act in accordance with the highest standards. See, e. g., York International Building, Inc. v. Chaney, 527 F.2d 1061 (9th Cir. 1975); Moulded Products, Inc. v. Barry, 474 F.2d 220 (8th Cir.), cert. denied,412 U.S. 940, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973). Almost fifty years ago Chief Judge Cardozo of the New York Court of Appeals expressed the rule thusly:
 
 
 85
 "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. (Citation omitted.) Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546 (1928).
 
 
 86
 In a similar vein, but with less flair, the Supreme Court in 1951 stated:"Equity tolerates in bankruptcy trustees no interest adverse to the trust. This is not because such interests are always corrupt but because they are always corrupting. By its exclusion of the trustee from any personal interest, it seeks to avoid such delicate inquiries as we have here into the conduct of its own appointees by exacting from them forbearance of all opportunities to advance self-interest that might bring the disinterestedness of their administration into question." Mosser v. Darrow, 341 U.S. 267, 271, 71 S.Ct. 680, 682, 95 L.Ed. 927 (1951).
 
 
 87
 These quotes are as applicable today as they were when the respective opinions were first written.
 
 
 88
 When a trustee has breached his trust, an equity court may hold him liable for any loss or depreciation in the value of the estate resulting from the wrongful act or omission. In re Imperial "400" National, Inc., 456 F.2d 926, 931 (3rd Cir. 1972), citing Restatement of Trusts (2d) § 205 (1959), and III Scott on Trusts, § 205, p. 1665 (3d ed. 1967). In addition, an unfaithful trustee may be held responsible for any lost profit which would have accrued to the trust estate but for the breach of trust. Imperial, supra. In the case at hand it is our opinion that CMRCO may have suffered some loss because of the conflict of interest created by brother dealing with brother. If any such loss occurred, then the trustee should be held liable for it. A trustee should not only avoid impropriety, but also, even the appearance of impropriety, in all of his fiduciary dealings. It is not enough that the court respect the trustee's integrity and competence; he simply should not act in any matter where so blatant a conflict of interest exists. Paul Gemmill should have disqualified himself and left the adjustment of the problem to the court or to a substitute subject to its approval.
 
 
 89
 In light of the above reasoning, we remand this aspect of the case to the district court for consideration of whether the compromise resulted in any loss to CMRCO, or lost gain, and if so, whether Paul Gemmill should be held personally liable for such loss. The district court is instructed to appoint an independent appraiser, not hitherfore connected with this case, to determine the value of the Comet Mines property, so as to provide the court with some idea of the worth of the stock given up by CMRCO.
 
 CONFIRMATION OF PLAN OF REORGANIZATION
 
 90
 The appellant challenges the court's action in confirming the plan of reorganization in several of his briefs. Basically the objections are:
 
 
 91
 1. The plan provides for the liquidation of the debtor's assets rather than a corporate reorganization contemplated by Chapter X;
 
 
 92
 2. The plan did not receive the requisite creditor approval.
 
 
 93
 The plan which the court confirmed was actually the fourth plan that had been proposed by the trustee. The other three had failed for various reasons. The appellant contends that a plan which may result in liquidation is not within the congressional intent in enacting Chapter X. Therefore the debtor should be returned to the prior receivership or placed into ordinary bankruptcy. Collier notes that:
 
 
 94
 "Chapter X, like its predecessor § 77B, is a remedial statute, designed to effect the rehabilitation of corporate debtors through a legal method of reorganization which conserves the going-concern values of the property, avoids foreclosures and forced sales and enables the debtor to continue operations, yet affords full consideration of the rights of creditors and stockholders. Ordinary bankruptcy liquidation is not contemplated in the Chapter X proceeding, except upon failure of reorganization plans." 6 Collier on Bankruptcy (14th ed.), P 0.11, pp. 116-17 (1972) (Footnotes omitted).
 
 
 95
 However it has been held upon several occasions that the fact that the plan contemplates liquidation of some or all of the debtor's assets will not invalidate the plan. In re Chelsea Hotel Corp., 246 F.2d 133 (3d Cir. 1957); Patent Cereals v. Flynn, 149 F.2d 711 (2d Cir. 1945); In re Lorraine Castle Apartments Bldg. Corp., 149 F.2d 55 (7th Cir. 1945), cert. denied, 326 U.S. 728, 66 S.Ct. 35, 90 L.Ed. 432 (1946). In the latter case the objection was made, as here, that a plan of reorganization may not properly contemplate a sale of the debtor's property. The court pointed out that the Act itself provided for such sales under Chapter X. Collier is in accord:
 
 
 96
 "It should be pointed out that the emphasis heretofore laid on the preservation of going-concern values through the medium of a reorganization plan and the avoidance of forced liquidation sales does not mean that a plan which in effect provides for an orderly liquidation is not a proper plan of 'reorganization' under Chapter X. This is not as inconsistent as it may sound. In the first place, Chapter X requires that before a reorganization petition can be approved as in 'good faith' it must be demonstrated at the outset that there is a reasonable expectation of reorganization as contrasted with liquidation. But once the petition is approved, all expectations critically examined, and all avenues and possibilities thoroughly explored through the processes afforded by Chapter X, it ultimately may develop that some sort of liquidation is the more desirable and perhaps the only feasible method of winding up the debtor's estate. Such a situation is provided for by the terms of § 216(10), and thus a plan which effects an orderly liquidation is within the legislative intendment."
 
 
 97
 6A Collier, supra, P 10.02, pp. 421-23 (Footnotes omitted).
 
 In more general terms, Collier states:
 
 98
 "Thus while adequate provisions for execution of the reorganization plan are requisite, the choice of the means may be adjusted to the circumstances of the particular case."[13]
 
 
 99
 6A Collier, supra, P 10.19, p. 494.
 
 
 100
 The court in In re Lorraine Castle Apartments Bldg. Corp., supra, said:
 
 
 101
 "Here we find express authority for a plan of reorganization which contemplates the sale of all or any part of its property either free or subject to any lien at not less than a fair upset price. We know of no reason why, inasmuch as Congress has granted authority to approve a plan of such character, it should not be approved where it is found to be fair and feasible. Obviously sale and distribution of the proceeds amount to liquidation, but it is none the less within the definition of reorganization permitted by the Act of Congress and is in accord with the remedial provisions enacted by Congress." 149 F.2d at 58.
 
 
 102
 Appellant relies upon Fidelity Assurance Ass'n v. Sims, 318 U.S. 608, 63 S.Ct. 807, 87 L.Ed. 1032 (1943), as precluding a plan of reorganization which at the very outset is based upon liquidation. Sims, however, dealt with the question of dismissal because the proceeding under Chapter X was not begun in good faith. In In re Chelsea Hotel Corp., In re Lorraine Castle Apartments Bldg. Corp. and Patent Cereals, supra, the courts viewed Sims as applying only when from the very outset of the proceedings liquidation was the only realistic possibility. Said the Court in Sims: "In the light of all relevant facts, it seems clear that Fidelity cannot be reorganized for the purpose of conducting its old business of selling investment certificates." 318 U.S. at 616, 63 S.Ct. at 811. Not so here. Appraisals of the property at current market value ran as high as approximately ten and one-half millions of dollars (Brief of Petro-Silver, Inc. at 8), providing a substantial corporate nest egg for the stockholders to manage after payment of creditors. The trial court was therefore entirely justified in finding as it did that the petition was filed in good faith and that Sims was not applicable.
 
 
 103
 The second argument advanced by appellant is that the plan did not receive creditor acceptance as required by section 179 of the Bankruptcy Act (11 U.S.C. § 579). The statute requires the approval of two-thirds in amount of each class of creditors in order for the district court to confirm a plan.
 
 
 104
 "After a plan has been accepted in writing, filed in court, by or on behalf of creditors holding two-thirds in amount of the claims filed and allowed of each class, and, if the debtor has not been found to be insolvent, by or on behalf of stockholders holding the majority of stock, or which proofs have been filed and allowed, of each class, exclusive of creditors or stockholders or of any class of them who are not affected by the plan . . . or for whom payment or protection has been provided as prescribed in paragraphs (7) and (8) of section 216 of this title (11 U.S.C. § 616(7) and (8)), the judge shall fix a hearing . . . for the consideration of the confirmation of the plan. . . ."
 
 
 105
 Here, classes 5 and 6 (common creditors and non-secured creditors), did not give the necessary approval. The court held that because the amended plan provided for the sale or other disposition of assets as might be necessary to pay them in full and in cash their acceptances were not necessary to the plan's confirmation. The court specifically found:
 
 
 106
 "5. That the amended plan is in the nature of a liquidating plan providing for the sale or other disposition of assets as shall be necessary to pay creditors in cash in full, upon notice and approval of this court and upon such terms and conditions as shall be most favorable to the creditors and stockholders. Accordingly, creditors included in said classes are not deemed to be affected by said amended plan and their acceptance is not essential to confirmation of the plan (Country Life Apartments v. Buckley (C.C.A., 2nd Cir.), 145 F.2d 935). Even assuming said claimants could be deemed to be affected by said amended plan the proposed sale of assets necessary to pay their claims in cash in full is adequate protection for the realization by them of the value of their claims against the property dealt with by the plan and affected by such claims in compliance with the provisions of Section 216(7) of said Act (11 U.S.C. § 616(7))."
 
 
 107
 It also found, "9. That the said amended plan is fair and equitable, and feasible" and that "10. That the proposal of the said amended plan and its acceptance are in good faith . . . ." (C.T. at 2377).
 
 
 108
 Section 179 of the Bankruptcy Act (11 U.S.C. § 579) specifically provides that the two-thirds approval is not necessary for creditors or shareholders "for whom payment or protection has been provided as prescribed in paragraphs (7) and (8) of section (216) of this Act . . . ." (11 U.S.C. § 616(7), (8)). Section 216 of the Act sets out certain elements that may or must be included in a plan; paragraph 7 requires that a plan:
 
 
 109
 "(S)hall provide for any class of creditors which is affected by and does not accept the plan by the two-thirds majority in amount required under this chapter, adequate protection for the realization by them of the value of their claims against the property dealt with by the plan and affected by such claims, either as provided in the plan or in the order confirming the plan, (a) by the transfer or sale, or by the retention by the debtor, of such property subject to such claims; or (b) by a sale of such property free of such claims, at not less than a fair upset price, and the transfer of such claims to the proceeds of such sale; or (c) by appraisal and payment in cash of the value of such claims; or (d) by such method as will, under and consistent with the circumstances of the particular case, equitably and fairly provide such protection. . . . "The district judge apparently concluded that the plan did equitably and fairly protect classes 5 and 6, and so concluded, under subsection (d) of § 216(7) that their approval was unnecessary. We are not convinced that such a conclusion was erroneous, and hold, therefore, that the plan was properly confirmed.
 
 APPEAL NO. 72-2882
 
 110
 This appeal is one of two not covered by the trustee's motion to dismiss for mootness. It is an appeal from an order of the district court denying appellant Bennett leave to file late objections to certain creditor claims made by Jeremiah Milbank and Milbank & Co. Bennett felt that the claims had been outlawed by the statute of limitations, and wanted to challenge the trustee's conclusion that the claims were valid. However, the period for filing of objections had passed, so that his objections were untimely. The district court, after a brief hearing on the matter, denied Bennett's motion for permission to file his objections to the claims, and Bennett filed a timely notice of appeal. It is this appeal that is one of those presently before us.
 
 
 111
 The matter is complicated by the fact that after Bennett's appeal had been perfected, the district court purportedly vacated its order denying Bennett's motion to file objections. All interested parties were invited to file their objections, and the district court calendared a hearing on the merits of the Milbank claims. Bennett's attorney took the position that the pending appeal had divested the district court of jurisdiction to vacate its order, and refused to file any objections or participate in the hearing. He also refused to dismiss the appeal, apparently on the ground that to do so would put him in a "bad light" before this court. (R.T. October 26, 1972, pp. 10-11). The court proceeded to consider another party's objections to the claims, based on the same statute of limitations argument raised by Bennett, and concluded that the claims were still valid. Subsequently, the trustee filed a motion with this Court to dismiss Bennett's appeal, which motion was denied.
 
 
 112
 Bennett is asking that this Court reverse the order denying him leave to file his late objections, and remand the case to the district court with instructions to permit him to file his objections and to hold a hearing to consider them. In essence, he is seeking precisely what the district court offered when it gave permission for the filing of objections and held a hearing.
 
 
 113
 At first glance, this appears to border on frivolity, because the appellant rejected the district court's offer of the exact relief he is seeking on appeal. However, Bennett appears to have been correct in arguing that the district court had no jurisdiction to vacate the order from which he was appealing.
 
 
 114
 The general rule is that once a notice of appeal has been filed, the lower court loses jurisdiction over the subject matter of the appeal. As stated in 9 Moore's Federal Practice, 2d ed., P 203.11, pp. 734-36:
 
 
 115
 "The filing of a timely and sufficient notice of appeal has the effect of immediately transferring jurisdiction from the district court to the court of appeals with respect to any matters involved in the appeal. . . . Thus, after a notice of appeal is timely filed, the district court has no power to vacate the judgment, or to grant the appellant's motion to dismiss the action without prejudice, or to allow the filing of amended or supplemental pleadings." (Footnotes omitted.)
 
 
 116
 Accord, Ruby v. Secretary of the U. S. Navy, 365 F.2d 385 (9th Cir. 1966), en banc, cert. denied, 386 U.S. 1011, 87 S.Ct. 1358, 18 L.Ed.2d 442 (1967); Corn v. Guam Coral Co., 318 F.2d 622 (9th Cir. 1963); Resnik v. La Paz Guest Ranch, 289 F.2d 814 (9th Cir. 1961). This rule is clearly necessary to prevent the procedural chaos that would result if concurrent jurisdiction were permitted.
 
 
 117
 Opposing this general rule is the well-established rule that a bankruptcy court has wide latitude to reconsider and vacate its prior decisions, so long as the proceedings have not been terminated, and no intervening rights have become vested which would be disturbed by a modification or reconsideration of the court's decision. Pfister v. Northern Illinois Finance Co., 317 U.S. 144, 63 S.Ct. 133, 87 L.Ed. 146 (1942); Wayne United Gas Co. v. Owens-Illinois Glass Co., 300 U.S. 131, 57 S.Ct. 382, 81 L.Ed. 557 (1937); Commercial Credit Corp. v. Skutt, 341 F.2d 177 (8th Cir. 1965); In re McGoldrick, 121 F.2d 746 (9th Cir. 1941). In Wayne Gas,supra, the Supreme Court seemingly stated that a bankruptcy court can vacate its decision even after an appeal thereof has been perfected:
 
 
 118
 "A court of equity may grant a rehearing, and vacate, alter, or amend its decree, after an appeal has been perfected and after the time for appeal has expired, but not after expiration of the term at which the decree is entered. It is true the bankruptcy court applies the doctrines of equity, but the fact that such a court has no terms and sits continuously, renders inapplicable the rules with respect to the want of power in a court of equity to vacate a decree after the term at which it was entered has ended.
 
 
 119
 But we think the court has the power, for good reason, to revise its judgments upon seasonable application and before rights have vested on the faith of its action. Courts of law and equity have such power, limited by the expiration of the term at which the judgment or decree was entered and not by the period allowed for appeal or by the fact that an appeal has been perfected. There is no controlling reason for denying a similar power to a court of bankruptcy or for limiting its exercise to the period allowed for appeal." 300 U.S. at 136, 137, 57 S.Ct. at 385 (emphasis added, footnotes omitted).
 
 
 120
 This language arguably indicates that bankruptcy courts are not bound by the general rule that an appeal divests the lower court of the power to modify the order or decision being appealed.
 
 
 121
 If Wayne Gas is accepted as controlling, then the district court's vacation of the order was not erroneous, and the appellant must lose. There would no longer be an appealable order, so obviously we would have no jurisdiction. However, accepting this view of the above-quoted language would require us to hold that a bankruptcy court and a court of appeals can have concurrent jurisdiction over the subject matter of an appeal. Such a holding would permit bankruptcy courts to divest the courts of appeals of jurisdiction over appeals by the simple expediency used by the district court in the case presently before us. We are of the opinion that no lower court should be able to vacate or modify an order under appeal, not even a bankruptcy court attempting to eliminate the need for a particular appeal. We do not read the Supreme Court's dicta in Wayne Gas to require a different result; rather, we think that the Court was simply emphasizing that bankruptcy courts have very broad powers to reconsider their decisions. We have found no cases in which a bankruptcy court was permitted to share jurisdiction with a court of appeals in the manner here attempted by the district court. Therefore, we conclude that the district court erred in entering an order purporting to vacate its order denying Bennett's application to file late objections; the court's subsequent order is a nullity, and the appealed order must stand as it was when the notice of appeal was filed.
 
 
 122
 Assuming that the district court was without jurisdiction to vacate its order, then the subsequent acceptance of objections and the holding of a hearing are also suspect, because the entire matter of Bennett's objections was no longer before the court. Hence, the appellant apparently was legally justified in refusing the district court's offer of leave to file his objections. Ignoring everything after the notice of appeal was filed, this case becomes a simple abuse of discretion problem; did the district court abuse its discretion in refusing to allow the appellant leave to file his objections? Even though the judge subsequently changed his mind, we can see no basis for a finding of an abuse of discretion. The matter was such that regardless of the judge's decision, he cannot be said to have abused his discretion.
 
 
 123
 Bennett presents several arguments as to why the district court erred in refusing to allow him permission to file his objections; however, these arguments miss the point. The district judge fixed a time for the filing of objections to claims, and Bennett failed to file his objections within that time period. The judge was empowered to set a time limit for the filing of objections (6A Collier on Bankruptcy, 14 ed., P 9.04, p. 160), and after that time had elapsed, any consideration of objections was discretionary. The judge chose not to accept the untimely objections, and none of Bennett's arguments convince us that the judge abused his discretion in so deciding.
 
 
 124
 Bennett argues first that §§ 57(f), (k), and 196 of the Bankruptcy Act (11 U.S.C. §§ 93, 596) somehow would have required the judge to accept and consider his late objections. Section 57(f) does not apply in Chapter X proceedings (6A Collier, supra, P 9.04, p. 159), and § 57(k) permits, but does not require, reconsideration of a claim which has been allowed. Section 196 provides for the summary disposition of objections to claims; however, it by no means requires a court to consider late objections. In short, the statutes cited by Bennett do not show any abuse of discretion by the judge.
 
 
 125
 Bennett next argues that he did not know about the Milbank claims until after the time for objections had elapsed. He contends that all of the claims were filed with the trustee and were not available in the district court; he also complains that he was not in possession of a list of the creditors and their claims at the time he filed his motion for leave to file objections. Neither of these points is a viable reason for reversing the district court's order. Under § 196 of the Act, the judge must prescribe the manner and fix the time for filing and allowing proofs of claims of creditors. This may be done by ordering that the proofs be filed with the trustee, as was done here. (6A Collier, supra, P 9.02, p. 135). In view of the fact that the trustee must be the one to make the initial determination as to the validity of the claims, such a procedure seems completely proper.
 
 
 126
 Admittedly, the filing of claims with the trustee might cause some difficulties if the appellant had attempted to investigate the claims. But both the record and the appellant's brief are void of any indication that he ever attempted to investigate any of the claims prior to the expiration of the period set by the court for filing objections. The last day for filing claims was April 16, 1971 (C.T. at 435), and the last day for filing objections was December 23, 1971 (C.T. at 1030). Bennett has not asserted that he attempted to obtain information about the claims; hence it does not appear that he was affected by the procedure that was followed. If Bennett had no knowledge of the Milbank claims, the fault is his, and his arguments as to the difficulties that he might have encountered had he attempted to investigate the claims are purely speculative.
 
 
 127
 Bennett also complains that no order was entered specifically allowing the Milbank claims. However, there is nothing wrong with this, particularly in view of the fact that such an order could not have been entered until the period for filing objections had passed. In short, we see no basis for a conclusion that the district judge abused his discretion in denying Bennett's motion for leave to file his untimely objections. Therefore, the order denying the motion is affirmed.
 
 APPEAL NO. 74-1606
 
 128
 This appeal concerns an order of the district court denying appellant Bennett's objections to the retention of Mr. LaMonte Robison as trustee. The issue arose when the district court accepted the resignation of Paul Gemmill as trustee of CMRCO, on November 14, 1973. The court immediately entered an order appointing Robison, formerly the accountant for the trustee, as trustee, and setting December 14, 1973, as the date for hearing objections to his retention as trustee. Both Bennett and U. V. Industries filed written objections to the retention of Robison, arguing that he was not "disinterested" as required by the Bankruptcy Act. After the hearing, the district judge denied the objections, in an order entered on December 26, 1973. (C.T. at 3304). On January 28, 1974, notices of appeal from Bennett and U. V. Industries were filed with the district court. (C.T. at 3323, 3325). U. V. Industries has since dismissed its appeal.
 
 
 129
 Before reaching the merits of the appeal, it will be necessary to determine whether Bennett's notice of appeal was timely. Fed.R.App.P. 4(a) establishes the mandatory time period for filing a notice of appeal as thirty days after the entry of the judgment or order, with certain exceptions that will be discussed below. Assuming a thirty-day period, and counting from December 27, 1973 (the day after the entry of the appealed order), the final day for filing of a notice of appeal was January 25, 1974. Both of the notices of appeal were dated January 24, 1974, and both were received and filed by the district court on January 28, 1974. January 25, 1974, was a Friday; hence the period was not extended beyond that date by virtue of Fed.R.App.P. 26(a).[14] Fed.R.App.P. 4(a) specifically provides that the notice of appeal must be filed with the district court within the proper period; therefore, the fact that the notices were dated prior to the final day does not save the appeals. Since the notices of appeal were not filed on or before January 25, 1974, it would appear that they were not timely, and that this Court has no jurisdiction unless there is an exception that operated to extend the time period.
 
 
 130
 There are two possible exceptions, both contained in Fed.R.App.P. 4(a). One is that if any party files a timely notice of appeal, the period for the other parties to file is extended by fourteen days. However, the only two notices of appeal in this case were both filed too late; U. V. Industries' appeal therefore cannot save Bennett's appeal.
 
 
 131
 The other possible exception is much more of a problem. Fed.R.App.P. 4(a) provides that "if the United States or an officer or agency thereof is a party, the notice of appeal may be filed by any party within 60 days of such entry." The IRS may have had claims against CMRCO, and a representative of the SEC did participate in many of the proceedings in the district court. The question is whether the IRS or the SEC was sufficiently involved to be considered a "party," for purposes of Fed.R.App.P. 4(a).
 
 
 132
 9 Moore's Federal Practice, P 204.10, pp. 925-26, discusses the question in some detail, but does not completely resolve the question:
 
 
 133
 "As has been noted, Rule 4(a), unlike former Civil Rule 73(a), governs appeals in bankruptcy proceedings. As a result the provision fixing sixty days as the time for an appeal in an action in which the government is a party extends for the first time to bankruptcy proceedings. The United States is a creditor in a great many bankruptcy proceedings, either for taxes or for other indebtedness, and it not infrequently intervenes generally in a general bankruptcy proceeding. Should its status as a creditor or as a general intervenor make every controversy arising in a general proceeding an action in which the United States is a party? The answer should be no. Bankruptcy involves many diverse and often unrelated proceedings. It is to those that Rule 4(a) refers when it mentions 'a proceeding in bankruptcy or a controversy arising therein.' Each such has its own participants. If the United States is a participant then the proceeding is one in which it is a party; otherwise, it is not. Suppose, for example, that A files a reclamation petition and the United States, either as a creditor or as an intervenor, supports or opposes the petition. It is clearly a party. But if it takes no part in the controversy the mere fact that it is in the general proceeding should not make the controversy one to which it is a party. To hold otherwise is to make sixty days the general time for appeal in countless bankruptcy matters without any reason for the added time. . . . A party to a particular bankruptcy proceeding or controversy in which the United States evidences no interest cannot reasonably suppose that the United States is a party."
 
 
 134
 We agree with Professor Moore that in bankruptcy proceedings, the United States should not be deemed a "party," for purposes of Fed.R.App.P. 4(a), unless it is a participant in the particular controversy which led to the appeal. Otherwise, the period for appeal will be sixty days in many cases where the longer period is not appropriate. Utilizing the standard set out in Moore's, the issue is whether either the IRS or the SEC was a participant in the proceedings involving Robison's retention as trustee. As far as the IRS is concerned, the answer is clearly in the negative. At the time of these proceedings, the plan of reorganization had already been confirmed; by that plan, any claim of the IRS would have been given top priority. (Cf. § 64(a)(4) of the Act, 11 U.S.C. § 104(a)(4)). Hence, it apparently had no interest in these reorganization proceedings, so long as its claim was not forgotten. The IRS made no appearance and filed no papers in the proceedings leading to the court's order denying the objections to Robison; indeed, it apparently made no appearance at all, so far as the record discloses. Hence it would not have appealed, and there was no basis for the appellant to think that he had sixty days rather than thirty.
 
 
 135
 The participation of the SEC in the proceedings might be thought to be sufficient involvement to render applicable the sixty day provision of Fed.R.App.P. 4(a). It did file a notice of appearance, and one of its attorneys wrote a letter to the court in specific response to Bennett's objections to Robison's retention as trustee. Section 208 of the Act (11 U.S.C. § 608) specifically provides that if the SEC makes an appearance, "the Commission shall be deemed to be a party in interest . . . ." However, § 208 also prohibits any appeal by the SEC in a reorganization proceeding. Since the sixty days are intended to give the Government sufficient time to determine whether or not to appeal (9 Moore's P 204.10, pp. 923-24), there is obviously no need to extend the period beyond thirty days when there is no possibility of an appeal. Therefore, even though the SEC is a "party" in the district court, we hold that it is not a "party" for the purposes of Fed.R.App.P. 4(a).
 
 CONCLUSION
 
 136
 We have already dismissed Appeals No. 73-2330, 73-2907, 73-3143, 74-1298, 74-1776, and 74-2375. In addition we dismiss Appeal No. 74-1606 for lack of a timely notice of appeal. The orders appealed from in No. 72-2882 and No. 73-2155 are affirmed. And finally, regarding Appeal No. 72-2755, we remand the action for reconsideration of the trustee's compromise of his brother's claim in light of this opinion.
 
 
 
 *
 Honorable William T. Sweigert, United States District Judge, Northern District of California, sitting by designation
 
 
 [1]
 According to Bankruptcy Rule 10-601, a reorganization petition will operate as a stay of any proceeding to enforce a lien against the property of a debtor. While this rule was not in effect in 1970, the Advisory Committee's Note indicates that the jurisdictional grant of § 111 of the Bankruptcy Act (11 U.S.C. § 511) includes granting stays. Section 111 gives the court in which the petition is filed exclusive jurisdiction over the debtor's property. In the present case, immediately upon the filing of the petition, the district judge issued an order specifically staying U.V. Industries from foreclosing on CMRCO's property. (Appeal No. 73-2155, Clerk's Transcript, pp. 15-18)
 
 
 [2]
 Under § 117 of the Act (11 U.S.C. § 517), the judge is permitted, but not required, to refer the proceeding to a bankruptcy referee (now known as a bankruptcy judge)
 
 
 [3]
 The sole exception was an order entered on August 1, 1973, authorizing the sale of certain real property in Bauer, Utah. U.V. Industries, which at that time was still interested in the proceedings, successfully applied to this Court for a stay of the order. This particular order, and the effect of the stay, will be discussed in detail infra
 
 
 [4]
 Irving Bennett, the appellant in the subject appeals, holds three promissory notes for loans made to the debtor corporation and is the owner of 15,000 shares of the debtor's capital stock, representing .5 percent of the issued and outstanding stock of the debtor corporation. The only other remaining appellant is Charles Steen, who is appealing individually and as custodian, in Appeal No. 73-2330
 
 
 [5]
 Bankruptcy Rule 10-801(2) adds the following to Bankruptcy Rule 805, which controls the obtaining of a stay of a bankruptcy judge's order pending appeal to district court:
 "Unless an order approving a sale of property of issuance of a certificate of indebtedness is stayed pending appeal, the sale to a good faith purchaser or the issuance of a certificate to a good faith holder shall not be affected by the reversal or modification of such order on appeal whether or not the purchaser or holder knows of the pendency of the appeal."
 The new Bankruptcy Rules do not apply directly to this case, since they were only recently adopted, but the rationale of the above-cited rule is most persuasive.
 
 
 [6]
 Had he not done so, and the transaction aborted, he might well have been charged with some dereliction for his failure
 
 
 [7]
 The appellant did on one occasion seek a stay from this Court of all of the district court's orders of June 4, 1973. The appellant's motion was denied without prejudice because he had not complied with Fed.R.App.P. 8, which requires generally that the district court must first deny a stay before one can be sought from the court of appeals
 
 
 [8]
 Among CMRCO's assets was a one-half undivided interest in 11 patented mining claims, 5 unpatented millsite claims and 2 small town lots at the town of Crested Butte in Gunnison County, Colorado. CMRCO's interest had been acquired as part of the settlement of litigation and bore no valuation on the books. The property was situated at the 11,000-foot elevation and was only briefly accessible during summer months. The property had been leased to one Lester Gold, trustee for another mining group, for a term of 25 years subject to the right of sooner termination by the lessee. Termination notice was given by the lessee for March 1, 1973, unless the terms could be modified. After considerable negotiation the trustee and the lessee agreed upon an outright sale price of the entire property for $45,000 cash plus a one-half percent override or royalty upon net smelter returns until $310,000 was received. All these negotiations occurred prior to the hearing on the amended plan for reorganization. The owner of the other undivided interest accepted a similar offer for his portion
 
 
 [9]
 The stay application was based on Fed.R.Civ.P. 62(d), which provides:
 "(d) Stay Upon Appeal. When an appeal is taken the appellant by giving a supersedeas bond may obtain a stay subject to the exceptions contained in subdivision (a) of this rule. The bond may be given at or after the time of filing the notice of appeal or of procuring the order allowing the appeal, as the case may be. The stay is effective when the supersedeas bond is approved by the court."
 
 
 [10]
 The language of the order is as follows:
 "The motion of the appellant UV Industries, Inc., filed herein on October 3, 1973, is granted.
 "Accordingly, the District Court's Order of July 30, 1973, authorizing the trustee to sell certain property at Bauer, Tooele County, Utah is stayed pending the disposition of the appeal or until further Order of this court."
 
 
 [11]
 In Appeals No. 73-2155 and 73-2330, the appellant again seeks to surcharge the trustee if he does not reacquire the various properties that were affected by the orders being appealed. Unlike Appeal No. 72-2755, however, appellant's briefs do not indicate how the trustee might have breached his fiduciary duty. Except for a few conclusory allegations unsupported by the record, there is no hint in either the briefs or the record of any possible wrongdoing by the trustee. Indeed, all of the trustee's actions involved in these two appeals were specifically approved by the district judge after several hearings in open court. Since there appears to be no possible basis for utilization of the remedy of surcharge, with regard to Appeals No. 73-2155 and 73-2330, we will not permit this issue to affect our ultimate disposition of the motion to dismiss
 
 
 [12]
 The appellant did not appeal from the order approving the plan; he only appealed from the order of confirmation
 
 
 [13]
 Subsection 10 of § 216 (11 U.S.C. § 616(10)) recites what is meant by adequate means, stating that they:
 "may include: the retention by the debtor of all or any part of its property; the sale or transfer of all or any part of its property to one or more other corporations theretofore organized or thereafter to be organized; the merger or consolidation of the debtor with one or more other corporations; the sale of all or any part of its property, either subject to or free from any lien, at not less than a fair upset price and the distribution of all or any assets, or the proceeds derived from the sale thereof, among those having an interest therein; . . ." 6A Collier on Bankruptcy, (14th ed.) P 10.19, p. 495.
 
 
 [14]
 Fed.R.App.P. 26(a) sets out the procedure for computation of time:
 "In computing any period of time prescribed by these rules, by an order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period shall be included, unless it is a Saturday, a Sunday, or a legal holiday, in which event the period extends until the end of the next day which is not a Saturday, a Sunday, or a legal holiday. . . . "