John LONBERG, an individual; Ruthee Goldkorn, an individual, Plaintiffs–Appellants,

and

United States of America, Intervenor,

v.

SANBORN THEATERS INC, a California corporation d/b/a Market Place Cinema; Salts, Troutman & Kaneshiro Inc., a California corporation; West Coast Realty Investors Inc., a Delaware corporation, Defendants–Appellees.

No. 99–56221.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 7, 2001

Filed Aug. 6, 2001

Terry Kilpatrick (argued), San Diego, California, for the plaintiffs-appellants.

Gregory F. Hurley and Michael J. Mills (argued), Kutak Rock, Newport Beach, California, for the defendants-appellees.

Before: D.W. NELSON, O'SCANNLAIN, and KLEINFELD, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether an architect can be held liable for designing a movie theater which is not in compliance with the Americans with Disabilities Act.

I

The Market Place Cinema ("Market Place") is located in Riverside, California, and is a multiplex theater with four auditorium-style and two stadium-style movie theaters. Market Place is operated by Sanborn Theaters, Inc. ("Sanborn"). The owner of the property and building is West Coast Realty Investors, Inc. ("West Coast"). The architect of Market Place, retained by Sanborn, was Salts, Troutman & Kaneshiro, Inc. ("STK"). STK is neither the owner, lessee, lessor, nor operator of Market Place.

John Lonberg and Ruthee Goldkorn are physically disabled and require the use of a wheelchair for mobility. On September 4, 1997, Lonberg and Goldkorn filed this suit against Sanborn, West Coast, and STK for violating the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, as well as California state law because, they alleged, various aspects of Market Place were not sufficiently accessible to persons who use wheelchairs.[1] The only claim they brought against STK was for injunctive relief in that it had violated Title III of the ADA, 42 U.S.C. § 12181 *et seq.*, because it had failed to "design and construct" Market Place such that it was "readily accessible to and usable by individuals with disabilities," 42 U.S.C. § 12183(a).

STK moved for partial summary judgment on the one claim against it on the grounds that 1) only owners, lessees, lessors, and operators can be liable for discrimination under Title III of the ADA, and it was none of these; and 2) only persons who both design and construct a building can violate § 12183(a), and it did not construct Market Place. On November 17, 1998, the district court rejected STK's first theory, but granted it partial summary judgment based on the latter.

The district court did not enter final judgment in favor of STK pursuant to Fed.R.Civ.P. 54(b) until May 11, 1999.[2] In the meantime, on March 30, 1999, it granted a motion by the United States to intervene in this case. On April 8, 1999, the United States filed a complaint with claims only against Sanborn and did not join

1. Their allegations included the charges that the wheelchair seating areas were not large enough to accommodate a wheelchair, the wheelchair seating areas did not have lines of sight comparable to that offered to the general public, the wheelchair seating areas did not have a companion seat next to them, there were an absence of transfer seats to provide persons in wheelchairs the option of transferring to a regular seat, the restroom stalls were not large enough to accommodate wheelchairs, the emergency exits were not large enough to accommodate wheelchairs, and the emergency exit ramps were too steep to be used safely by persons in wheelchairs.

2. The claims against the other defendants continued unabated until they were stayed by the district court pending the outcome of substantially similar litigation elsewhere in the Central District of California.

STK. On June 30, 1999, Lonberg and Goldkorn filed their notice of appeal to the Ninth Circuit.

On September 16, 1999, STK filed a motion to dismiss because Lonberg and Goldkorn filed their notice more than 30 days after entry of the judgment. The motion to dismiss was subsequently denied by our Appellate Commissioner without prejudice.

## II

We first confront STK's jurisdictional argument. In a civil case, a party normally has only 30 days within which to file a notice of appeal. Fed. R.App. P. 4(a)(1)(A). There is an exception, however, when "the United States or its officer or agency is a party"; in such cases, *all* parties have 60 days. Fed. R.App. P. 4(a)(1)(B). Here, Lonberg and Goldkorn filed their notice 50 days after the judgment was entered, which, they argue, was timely because the United States became a named party once it intervened.

■ STK argues that the United States is not a "party" within the meaning of Rule 4 for the purposes of this appeal for each of the following reasons: 1) the United States did not intervene until after partial summary judgment had been granted to

STK (although it did intervene before that judgment had been entered); 2) the United States filed no claim against, and therefore has no interest in proceedings involving, STK; and, 3) the United States is not a party to this particular appeal.

Taking the last argument first, it is of no moment that the United States is not a party to the appeal in question.[3] *In re Paris Air Crash of March 3, 1974*, 578 F.2d 264, 265 (9th Cir.1978) (per curiam) ("[E]ven though it is not a party to the appeal, [the United States] is a 'party' for purposes of F.R.A.P. 4(a) and the 60–day time limit for appeal applies.").

■ As for the second argument, the United States became a "party" to the case even though it intervened to file a claim against only one of the three defendants. The United States need not have participated in the proceedings that gave rise to the appeal for the 60–day period to attach. *In re Paris Air Crash*, 578 F.2d at 265 (holding that 60–day period applied, even though "the United States was not directly involved in this particular procedural facet of the case"); *Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of America*, 808 F.2d 133, 134 (D.C.Cir.1987) (holding that "60–day limit applies to all parties in each of the actions," even though the United States was involved in only one of the three consolidated actions).[4]

---

**3.** While the United States filed no claim against STK when it intervened, it filed a brief *amicus curiae* in this appeal pursuant to Fed. R.App. P. 29(a), and it was permitted to participate at oral argument in support of Lonberg and Goldkorn.

**4.** STK makes much of the fact that, in *In re Paris Air Crash*, we noted that the United States "appears to have some continuing interest in this phase of the litigation by reason of an agreement for contribution." *In re Paris Air Crash*, 578 F.2d at 265. In doing so, however, we merely held that this interest, *inter alia*, was *sufficient* to satisfy Rule 4(a)(1)(B), not that it was *necessary* to do so. *Id.* The vast majority of courts to have considered the question have rejected the argument

that the United States must have an actual interest in the claim on appeal to qualify as a "party" under Rule 4. *E.g., Cohen v. Empire Blue Cross and Blue Shield,* 176 F.3d 35, 40 (2d Cir.1999) ("[W]e need not determine whether the United States has an interest in the appeal; the 60–day deadline is applicable if the United States was a party to the action at any stage of the litigation."); *In re Burlington Northern, Inc., Employment Practices Litigation,* 810 F.2d 601, 606 (7th Cir.1987) ("[T]he fact that the United States was not directly concerned with the particular decision appealed ... is irrelevant."); 16A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3950.2, at 132 (3d ed. 1999) ("Most cases, correctly it is thought, have allowed the 60–day period

Finally, it does not matter that the United States became a party to the appeal after partial summary judgment was granted so long as judgment had not been entered. It is the latter date which starts the clock to file a notice of appeal under Rule 4. Fed. R.App. P. 4(a)(1)(A),(B) (setting forth time to file from the date on which "the judgment or order appealed from is entered"). Moreover, because the United States need not have participated in the proceedings that gave rise to the appeal for the 60–day period to attach, it makes no difference to the parties on appeal whether the United States intervened one day before judgment was entered or the day after the litigation was filed. Finally, the bright-line rule that the 60–day period attaches whenever the United States becomes a party to the case before the judgment appealed from is entered furthers our expressed preference for interpreting Rule 4 "to eliminate the ... uncertainty" of its application. *In re Paris Air Crash*, 578 F.2d at 265.

Lonberg and Goldkorn having had 60 days in which to file their notice of appeal, we hold that their notice of appeal was timely, and, therefore, we have jurisdiction over their appeal under 28 U.S.C. § 1291.

whenever the government, or its officer or agency, is a named party to the case, even though the government has no interest in the particular issue that is being appealed.").

In should be noted that there is some contrary language in one of our cases, *In re Combined Metals Reduction Co.*, 557 F.2d 179 (9th Cir.1977). In *Combined Metals*, we held that "the United States should not be deemed a 'party,' for purposes of Fed R.App. P. 4(a), unless it is a participant in the particular controversy which led to the appeal." *Id.* at 204. We made this holding, however, in the context of bankruptcy proceedings, where the United States is often involved as a creditor for taxes. Because the United States frequently intervenes in these proceedings, limit-

## III

We next turn to the merits. The ADA is comprised of three parts: Title I, 42 U.S.C. § 12111 *et seq.*, which prohibits discrimination against the disabled with regard to employment; Title II, 42 U.S.C. § 12131 *et seq.*, which prohibits discrimination against the disabled by public entities; and, Title III, 42 U.S.C. § 12181 *et seq.*, which prohibits discrimination against the disabled with regard to access to commercial buildings. *PGA Tour, Inc. v. Martin*, 531 U.S. 1049, 121 S.Ct. 1879, 1889, 149 L.Ed.2d 904 (2001). The text of each title follows the same basic structure: each includes one provision which sets forth a rule of liability that prohibits "discrimination" against the disabled by certain individuals, and each includes subsequent provisions which set forth what actions by these individuals constitute the prohibited "discrimination." [5]

### A

Neither Title I nor Title II is implicated in this appeal. Title III sets forth the following "[g]eneral rule" of liability with respect to access to commercial buildings:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods,

ing the applicability of the 60–day period in *Combined Metals* was appropriate, lest it become the rule rather than the exception in bankruptcy cases. *Id.* We apparently saw no reason to extend the *Combined Metals* holding beyond the peculiar circumstances of bankruptcy proceedings when we considered the *In re Paris Air Crash* case, and we see no reason to do so here.

5. In Title I, discrimination by employers is prohibited by 42 U.S.C. § 12112(a), and the activities constituting discrimination are defined in § 12112(b). In Title II, discrimination by public entities is prohibited by 42 U.S.C. § 12132, and the activities constituting discrimination are defined in §§ 12142, 12143, 12144, 12146, 12147, 12148, 12162.

services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a); *see also Martin,* 121 S.Ct. at 1889, 1890, 1891, 1893 (recognizing this provision as the "general rule" of liability under Title III). Three aspects of this "[g]eneral rule" are notable for our purposes. First, it prohibits only discrimination with regard to access to a "place of public accommodation." Second, it limits who may be liable for discrimination only to a person "who owns, leases (or leases to), or operates a place of public accommodation." Finally, it does not define what constitutes "discrimination."

Subsequent provisions of Title III define the activities which constitute "discrimination" in the "[g]eneral rule" of liability. For example, in the next subsection, entitled "Construction" (presumably meaning construction of the text of the "[g]eneral rule" of liability), the statute sets forth several activities which constitute "discrimination." 42 U.S.C. § 12182(b). And, more importantly for our purposes, the next section, under the heading "Application of term" (presumably referring to the term "discriminate" in the "[g]eneral rule" of liability), describes the following conduct which constitutes "discrimination":

> [A]s applied to public accommodations and commercial facilities, discrimination for purposes of section 12182(a) of this title includes—
>
> > (1) a failure to design and construct facilities for first occupancy ... that are readily accessible to and usable by individuals with disabilities....

42 U.S.C. § 12183(a).

Lonberg and Goldkorn are suing STK under § 12183(a)(1) for its alleged "failure to design and construct" Market Place in a manner "readily accessible" to their wheelchairs. The parties concede that Market Place is a place of public accommodation. They also concede, however, that STK is not the owner, lessee, lessor, or operator of Market Place. The narrow question before us, then, is whether STK can be liable for "design and construct" discrimination even though it is not one of the entities-owners, lessees, lessors, or operators-to whom liability is extended by the "[g]eneral rule" under § 12182(a).

### B

Lonberg and Goldkorn, along with the United States, argue that liability for discrimination under Title III is not limited to owners, lessees, lessors, or operators. They argue that the provision setting forth one instance of "discrimination" under Title III as the "failure to design and construct" compliant facilities, 42 U.S.C. § 12183(a), does more than merely define "discrimination" in the "[g]eneral rule" of Title III. They argue that liability for "design and construct" discrimination is unencumbered by the limitation on liable parties found in the "[g]eneral rule," and, instead, extends to anyone who designs and constructs a noncompliant building.

The basis for their argument centers around the word "commercial facility" in § 12183(a). That is, in the process of expounding what conduct constitutes "discrimination" in the "[g]eneral rule" of § 12182(a), § 12183(a) provides that, "as applied to public accommodations *and commercial facilities,* discrimination ... includes ... a failure to design and construct" compliant buildings. 42 U.S.C. § 12183(a) (emphasis added). "Commercial facilities" is defined in Title III to encompass a broader range of commercial buildings than does "public accommodations." *Compare* 42 U.S.C. § 12181(2) *with* 42 U.S.C. § 12181(7). As Lonberg, Goldkorn, and the United States see it, the "[g]eneral rule" in § 12182(a) extends lia-

bility to a person "who owns, leases (or leases to), or operates *a place of public accommodation.*" 42 U.S.C. § 12182(a) (emphasis added). Thus, they argue, if § 12183(a) is read simply to define the conduct that constitutes "discrimination" in the "[g]eneral rule" of § 12182(a), then no one will be liable for "design and construct" discrimination with regard to *commercial facilities,* even though Congress apparently went out of its way in § 12183(a) to reach such conduct.[6] In essence, Lonberg, Goldkorn, and the United States argue that if liability is strictly limited to those identified in the "[g]eneral rule," then a subsequent provision of Title III establishes a species of discrimination-failure to design and to construct a compliant commercial facility-for which no one is liable.

### C

Of course, owners, lessees, lessors, and operators are clearly subject to liability for the failure to "design and construct" a building in compliance with the ADA under the "[g]eneral rule." 42 U.S.C. § 12182(a). Here, however, we have only the architect before us, and, perhaps, the implicit suggestion is that, despite the fact that Lonberg and Goldkorn also sued the owners and operators of Market Place in this litigation, the architect must be made liable as well because he had more control over the "design and construct" functions.

Many courts have recognized this problem, and they have offered two different solutions. One group has simply extended the reach of liability for "design and construct" discrimination beyond those set forth in the "[g]eneral rule." *United States v. Days Inns,* 151 F.3d 822, 824–25

(8th Cir.1998) (extending liability under Title III to franchisors); *United States v. Days Inns,* 997 F.Supp. 1080, 1084–85 (C.D.Ill.1998) (same); *United States v. Ellerbe Becket, Inc.,* 976 F.Supp. 1262, 1267–68 (D.Minn.1997) (extending liability under Title III to architects); *Johanson v. Huizenga Holdings, Inc.,* 963 F.Supp. 1175, 1177–78 (S.D.Fla.1997) (same). Rather than hold, however, that all those involved in the design and construction can be held liable for "design and construct" discrimination, these courts have, instead, created a category of liability found nowhere in the text or legislative history of the ADA; namely, anyone possessing a "significant degree of control over the final design and construction of a facility" is liable. *Days Inns,* 151 F.3d at 826; *accord Days Inns,* 997 F.Supp. at 1084–85; *Ellerbe Becket,* 976 F.Supp. at 1267–68; *Johanson,* 963 F.Supp. at 1177–78. This "significant degree of control" approach is the one urged upon us by Lonberg, Goldkorn, and the United States. It is also the approach adopted by the district court in this case.

The other group of courts has limited liability for the "failure to design and construct" ADA-compliant buildings parallel to those who were specified in the "[g]eneral rule"; that is, only owners, lessees, lessors, and operators of *either* public accommodations *or* commercial facilities are made liable under Title III for "design and construct" discrimination. *United States v. Days Inns,* 22 F.Supp.2d 612, 615–16 (E.D.Ky.1998) (refusing to extend liability under Title III to franchisors); *United States v. Days Inns,* 8 AD Cases 491, 1998 WL 461203 at \*2–\*4 (E.D.Cal.1998) (same); *Paralyzed Veterans of America v. Ellerbe Becket,* 945 F.Supp. 1, 2 (D.D.C.

---

**6.** Because Market Place is a "public accommodation" within the meaning of the ADA, 42 U.S.C. § 12181(7)(C) (including "motion picture house"), we do not decide whether, in § 12183(a), Congress was effective in its apparent attempt to extend liability for "design and construct" discrimination to "commercial facilities" that are not "public accommodations."

1996) (refusing to extend liability under Title III to architects). Although the evidence does not perfectly align in its favor, this "parallel" interpretation adopted by these courts is the one more consistent with the text and structure of the statute.[7]

1

■ First, as to the text of Title III, the "parallel" interpretation is consistent with language in § 12183(a) that appears to have "applied" the "[g]eneral rule" to commercial facilities. That section reads: *"as applied to* public accommodations and *commercial facilities,* discrimination for the purposes of § 12182(a) of this title includes...."* 42 U.S.C. § 12183(a) (emphasis added). It is quite logical that Congress wanted the "[g]eneral rule" in § 12182(a), which refers only to public ac-

commodations, to be "applied" in the same way to commercial facilities for the purposes of "design and construct" discrimination. Moreover, because the "parallel" interpretation applies the list of liable entities specifically identified in § 12182(a) to the "design and construct" discrimination defined in § 12183(a), it avoids the problems created by the "significant degree of control" interpretation to divine liability wholly divorced from the text of the statute.

2

Second, the "parallel" interpretation is superior to the "significant degree of control" interpretation because it conforms to the general structure of the other titles of the ADA, which employ a general rule of liability to set forth who is liable, and

---

7. The legislative history of Title III offers conflicting evidence and is therefore inconclusive on this question. On the one hand, the bill originally introduced into Congress included all of what is now § 12182 and § 12183 in the same section, and made no distinction between public accommodations and commercial facilities; that is, all of the species of discrimination described in §§ 12182(b), 12183(a) applied without exception to both types of buildings. William L. Killion & Gregory R. Merz, *Franchisor Liability for Failure by Franchisees to Comply with the American's with Disabilities Act,* 19 Franchise L.J. 141, 152 (2000); William L. Killion & Troy A. Bader, *Compliance with the ADA: The Assault on Franchising,* Franchise L.J., Spring 1996, at 132. Congress separated § 12182 and § 12183 in the final bill in order to make a distinction between public accommodations and commercial facilities that would make the application of Title III to commercial facilities *more limited* than the application of Title III to public accommodations (i.e., the discrimination described in § 12182(b) applies only to public accommodations, whereas the discrimination described in § 12183(a), "design and construct" discrimination, applies to both public accommodations and commercial facilities). *Id.* Moreover, in the course of separating the two sections, Congress gave no indication that it

sought to make the parties who could be held liable for the discrimination described in § 12183(a) any different from the parties who could be held liable for the discrimination described in § 12182(b).

On the other hand, the original bill did not specify who could be liable for discrimination under Title III. Only *after* the two sections were separated, in order to narrow Title III's application to commercial facilities, did Congress add what it described as the "clarification" that only owners, lessees, lessors, and operators were liable for the prohibited discrimination. The fact that this provision identifying who could be liable was added after the separation, and only to § 12182, has led some commentators to argue that Congress did not want the discrimination described in § 12183(a) to be limited by this subsequently inserted provision as well. James P. Colgate, Note, *If You Build It, Can they Sue? Architects' Liability under Title III of the ADA,* 68 Fordham L.Rev. 137, 158–59 (1999). Other commentators, noting that the two sections were originally combined and that Congress described this subsequently inserted provision as a "clarification" rather than a substantive amendment, argue that Congress wanted this provision to apply to the acts of discrimination described in both sections. Killion & Bader, *supra,* at 132 & n. 28.

subsequent provisions to describe what constitutes discrimination.[8] Moreover, the relief available under Title III better comports with the "parallel" interpretation. With the exception of suits brought by the Attorney General in extreme cases under § 12188(b)(1)(B), actions under Title III are limited only to injunctive relief. 42 U.S.C. § 12188(a). This is significant because, after the noncompliant building has already been built, which is the case here, injunctive relief is only meaningful against the person currently in control of the building. That is, the architect who built the building, like STK in this case, is by the time of suit by an eligible plaintiff out of the picture. This limitation on relief suggests that reading Title III to make architects, and others who do not own, lease, or operate buildings, such as builders and construction subcontractors, liable for "design and construct" discrimination would create liability in persons against whom there is no meaningful remedy provided by the statute.[9]

**D**

■ We therefore hold that only an owner, lessee, lessor, or operator of a noncompliant public accommodation can be liable under Title III of the ADA for the "design and construct" discrimination described in § 12183(a). Because it is conceded that STK is not such a person, STK cannot be held liable for the "failure to design and construct" Market Place in a

manner compliant with the ADA.[10] As a result, we agree that partial summary judgment in favor of STK was appropriate in this case, albeit on a different ground than that asserted by the district court.

AFFIRMED.

---

**8.** See n. 5, *supra*, and accompanying text.

**9.** It is true that § 12188(a) allows plaintiffs to win injunctions if they merely have "reasonable grounds for believing that [they are] about to be subjected" to "design and construct" discrimination. 42 U.S.C. § 12188(a). One could argue that, unlike suits brought after a building has been built, injunctive relief would be meaningful against architects in pre-construction cases because it would stop them from designing a noncompliant building. It is also true, however, that such a

building could be stopped just as effectively by suing the owner, lessee, lessor, or operator of the structure being built because one of these parties, presumably, is paying for the architect's services. Thus, there is still no need to sue the architect.

**10.** We do not, of course, intimate any view on whether STK can be liable to Sanborn under tort and contract law for designing Market Place in manner that does not comply with the ADA.