**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 23-13678

————————————

FRANCISCO LAGOS MARMOL,
FERNANDO VAN PEBORGH,

*Plaintiffs-Appellants,*

*versus*

KALONYMUS DEVELOPMENT
PARTNERS, LLC,

*Defendant-Appellee.*

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:22-cv-20703-RNS

————————————

Before LUCK, LAGOA, and ABUDU, Circuit Judges.

LAGOA, Circuit Judge:

This case involves the straightforward breach of a real-estate contract. In June 2021, a buyer contracted with two sellers to

purchase a piece of property for $5,450,000, with a closing date in October 2021. The sellers breached that contract by failing to close by the closing date. The buyer then exercised its right under the contract to sue for specific performance and damages. Eventually, after a bench trial, the district court entered a final judgment in favor of the buyer, in which it found that the buyer was entitled to both specific performance and damages. The district court ordered the parties to close on the sale of the property, and the parties did just that. After careful review, and with the benefit of oral argument, we hold that the issue of specific performance here is moot. But because the issue of damages remains a live controversy, we proceed to the merits on that issue, affirming in part and reversing in part the district court's damages award.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In June 2021, Francisco Lagos Marmol and Fernando Van Peborgh (the "Sellers" or the "Appellants") and Kalonymus Development Partners, LLC, (the "Buyer" or "Kalonymus") signed a contract (the "Membership Purchase Agreement") under which Marmol and Van Peborgh would each sell their 50 percent ownership interests in Best Peacock Inn, LLC, to Kalonymus and/or its assignee for a purchase price of $5,450,000. Best Peacock Inn, LLC, owns a rental property in Miami known as the "Best Peacock Inn," the "Peacock Inn," or "Best Peacock." Kalonymus is a real-estate investment and development firm that is 100 percent owned by Maximilian Zeff. The closing date was set for September 13, 2021, which was extended to October 8, 2021, and then October 22, 2021.

Section 8.2 of the Membership Purchase Agreement lays out the Buyer's options in the event of the Sellers' breach:

> 8.2    In the event of a default by Seller under the terms of this Agreement, Buyer shall have the sole and exclusive remedies of either (i) terminating this Agreement, and receiving the return of its Deposit, whereupon all parties hereto shall be released and relieved from any and all further liability or obligations hereunder; or (ii) proceeding to enforce this Agreement by an action for specific performance, as Buyer shall thereby, without waiving Buyer's right to recover any and all losses, damages, costs and expenses resulting from Seller's default. Notwithstanding anything to the contrary herein contained, in the event of an intentional willful failure of Seller to perform any matter reasonably within its control or in the event any of the warranties and representations made by Seller herein shall be in any material respect inaccurate or there is an omission of a material fact necessary to make any representation of Seller not misleading in light of the circumstances under which it was made, Buyer shall have any and all remedies available to Buyer under the laws of the State of Florida.

The Sellers claim that, in early October 2021, they "discovered a provision in the property's mortgage that would prevent them from closing until January of 2022." Specifically, the Sellers claim they realized that "under certain terms of the promissory note, the mortgage could only be paid off during the first quarter

of each year, between January and March." Consequently, the Sellers told Kalonymus that they would be unable to hold up their end of the bargain by the closing date. Though the Sellers say they "did not remember or were not aware of the provision prior to October 2021," they concede that they breached the contract by failing to close.

On October 28, 2021, Kalonymus sent the Sellers a letter advising them that they were "in material default under several of [their] obligations" under the Membership Purchase Agreement. Kalonymus stated that it had entered into the Agreement "reliant upon [the Sellers'] express representations and warranties, which include[d]" the "execution, delivery, and performance of [the] Agreement." Kalonymus added that it "had every right to rely upon the truthfulness of each and every representation and warranty contained in the Purchase Agreement," and that it, "in fact, did detrimentally rely upon [the Sellers'] misrepresentations." Further:

> As [Kalonymus] has previously advised [the Sellers], [their] breaches and misrepresentations have resulted in [Kalonymus] suffering and continuing to incur significant losses and damages. [Kalonymus] has had to delay its financing resulting in increased transaction fees as well as substantial losses related to the terms of [its] loan, including a material increase in the interest rate. [The Sellers] have known for some time that [Kalonymus] would be financing this acquisition and [their] breaches and misconduct are a direct cause of the damages [Kalonymus] has sustained. Moreover,

this delay in closing will result in lost rental income to [Kalonymus], in an amount easily calculated based upon the current rent roll.

Over the next few months, the parties communicated about possible ways to salvage a deal. In December 2021, January 2022, and February 2022, the Sellers offered to sell Kalonymus the Best Peacock Inn at the same purchase price as laid out in the original Agreement. But Kalonymus declined, informing the Sellers that market conditions had changed for the worse, and that it would now be willing only to buy the property at a significant discount to make up for the damages it had incurred up until that point, including legal fees and lost rental income. Kalonymus advised the Sellers that they had failed to address the default, and that they could not "simply reset the closing date" and demand that Kalonymus accept the deal at the price originally negotiated. But the Sellers refused to sell at a reduced purchase price, calling Kalonymus's demands "totally unreasonable" and "unfair" in light of what they felt was a "short . . . delay in closing."

The deal having fallen through, Kalonymus exercised its option under Section 8.2 of the Membership Purchase Agreement to sue the Sellers for specific performance, while at the same time seeking damages. Kalonymus filed an action for specific performance and damages (for breach of contract) in state court. The Sellers then removed that action to federal court. Around the same time, the Sellers filed their own lawsuit against Kalonymus in federal court, asserting a single count for a declaratory judgment that Kalonymus—not the Sellers—had breached the Agreement. The

Sellers' theory was that, by seeking to enforce the contract through a lawsuit for specific performance, Kalonymus "elected to continue with and enforce the Agreement rather than terminate it." Thus, according to the Sellers, it was Kalonymus that breached the contract by rejecting the Sellers' post-October-2021 offers to close at the original purchase price.

These cases were consolidated before the district court. Kalonymus moved to dismiss the Sellers' complaint, which the district court granted on the ground that the requested declarations focused on acts committed in the past, and the court's adjudication of the issues would not prevent future monetary loss or lead either party to conform their behavior to the law. That holding disposed of the Sellers' complaint, so for all intents and purposes, Kalonymus became the Plaintiff in the case below, while Marmol and Van Peborgh became the Defendants.

After more litigation, the parties cross-moved for summary judgment. In the Sellers' motion, Marmol and Van Peborgh again argued that Kalonymus (1) remained bound by the Membership Purchase Agreement after the Sellers breached in October 2021 because it chose to sue for specific performance (as well as damages); (2) committed its own breaches over the next few months by failing to perform under the terms of the original contract; and (3) as a result, lost any claims for damages it might have had. Kalonymus also moved for summary judgment, arguing that it was entitled to specific performance of the Agreement and damages because (1) the parties had a valid contract; (2) the Sellers breached the contract

by failing to close in October 2021; and (3) Kalonymus was damaged by this breach. Kalonymus added that, under Florida law, a cause of action for breach of contract accrues at the time of the breach, so "the Sellers['] contention that Kalonymus was required to proceed with the closing in 2022 prior to filing suit is unavailing."

The district court first denied the Sellers' motion for summary judgment, finding that the Sellers had "fail[ed] to expressly even mention any of the four specific counts" alleged by Kalonymus, "never mind address whether there are genuine issues of material fact as to the elements of those counts." The district court then granted in part Kalonymus's motion for summary judgment, agreeing with Kalonymus that it had established all elements of a breach-of-contract claim. Although the district court "ha[d] no difficulty concluding that [Kalonymus] proved it was damaged by the Sellers' breach," the court found that "the parties' dispute regarding the amount of damages that should be awarded is not so straight forward." The case thus proceeded to a two-day bench trial on the matter of Kalonymus's damages, during which Zeff, Marmol, Van Peborgh, and Kalonymus's damages expert all testified. After the trial, the district court entered a final judgment in favor of Kalonymus, reiterating its finding that Kalonymus was entitled to specific performance, based on a sale price for the property of $5,150,000, and to damages in the amount of $1,553,245, provided that the Sellers kept their promise to finance part of the transaction. The court ordered the parties to close on the Best Peacock Inn on or before November 27, 2023, which the parties did.

The Sellers now appeal the district court's entries of summary and final judgment in favor of Kalonymus.

## II.    ANALYSIS

### A.    Specific Performance

Our first issue on appeal is whether the district court erred when it determined that Kalonymus was entitled to an award of specific performance, both when it granted summary judgment in favor of Kalonymus and when it entered a final judgment in favor of Kalonymus following the bench trial.  The Sellers advance two arguments for why the district court erred.  First, they argue that "Kalonymus is not entitled to an award of specific performance . . . because it did not meet its burden of proof of establishing its *prima facie* case," which includes proving that it was "ready, willing, and able to perform the contract according to its terms" in the first place.  Second, the Sellers argue that "Kalonymus is not entitled to an award of specific performance . . . because it failed to act in accordance with Section 8.2 of the Agreement and Florida law and materially breached the Agreement."  But we need not—and cannot—reach the merits of these arguments, because we conclude that the issue of specific performance is moot following the sale of the Best Peacock Inn.

"Article III of the Constitution restricts the power of federal courts to 'Cases' and 'Controversies.'" *Chafin v. Chafin*, 568 U.S. 165, 171 (2013) (quoting U.S. CONST. art. III, § 2).  Indeed, as the Supreme Court has often stated, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the

constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quotation marks omitted).

One doctrine deriving directly from the case-or-controversy requirement is the doctrine of mootness. *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1335 (11th Cir. 2001). The Supreme Court has explained that "a federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). Thus, a case is moot "when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1217 (11th Cir. 2000) (internal quotations omitted). Stated another way, "a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). This includes when "events subsequent to the commencement of a lawsuit create a situation in which the court can no longer give the plaintiff meaningful relief." *Fla. Ass'n of Rehab. Facilities*, 225 F.3d at 1217.

To sum up the relevant facts, Kalonymus contracted with the Sellers to buy the Best Peacock Inn for $5,450,000, with a closing date in October 2021. After the Sellers breached in October 2021, they offered to sell Kalonymus the property under the original terms of the contract, but Kalonymus refused unless the Sellers

lowered the price. The deal did not materialize, and Kalonymus exercised its right under the contract to sue for specific performance and damages. Eventually, the district court entered a final judgment in favor of Kalonymus, "reiterat[ing] the Buyer's entitlement to specific performance, based on a sale price for the property of $5,150,000."[1] "[I]n conformance with the verdict," the district court ordered the parties to "close on the sale of the property on or before November 27, 2023," which they did. This much is undisputed; the Sellers themselves tell us that they "closed on the sale of the shares" of the Best Peacock Inn "in compliance with the Final Judgment and pursuant to [the] court order directing them to close."

At closing, as authorized under the terms of the Membership Purchase Agreement,[2] Kalonymus assigned its "Membership Interests"—*i.e.*, its "rights, title and interests"—in the Best Peacock Inn to two other limited liability companies: 3667 Poinciana, LLC,

---

[1] In its verdict order following the bench trial, the district court found that the parties initially agreed on a sales price of $5,450,000 but later changed the price to $5,150,000 through an Amendment to the Membership Purchase Agreement. The Sellers now argue that the "Amendment was ineffective, and the purchase price remained $5,450,000." But they add that "whether the purchase price was $5,450,000 or $5,150,000, the analysis by Sellers [on appeal] does not change."

[2] The Membership Purchase Agreement was "made and entered into . . . by and among Francisco Lagos Marmol and Fernando Carlos Van Peborgh, each as to a 50% interest (collectively, 'Seller'), and Kalonymus Development Partners LLC, a Delaware limited liability company, *and/or its assignee* ('Buyer' or 'Purchaser'), and Best Peacock Inn, LLC[.]" (emphasis added).

and Poinciana, LLC. These two companies (the "Poinciana entities") acquired title to the Best Peacock Inn on November 28, 2023, as assignees of Kalonymus.

Also undisputed is the fact that the Sellers initially filed a motion to stay the final judgment but withdrew that motion prior to closing. On November 3, 2023, on the same day that they filed their notice of appeal, Marmol and Van Peborgh filed an "expedited motion for stay of execution of judgment pending appeal," in which they asked the district court to "stay[ ] the judgment of specific performance" to "meaningfully preserve their appellate remedies." The Sellers attested that, if "they are required to convey the Best Peacock by November 27, [2023,]" they will "lose the sole asset at issue in this case," and their appeal will be moot. They stated, in no uncertain terms:

> If [the] Sellers are denied a stay, they will be forced to convey the subject property and, as a result, their appeal will become effectively moot as to their challenge on appeal of the [c]ourt's Judgment granting specific performance to Kalonymus . . . . [The] Sellers are facing more than a *risk* of mootness: Absent a stay, their appeal of the [c]ourt's Final Judgment awarding specific performance to Kalonymus *will inevitably* become moot on November 27, 2023.

Kalonymus filed a response to the stay motion, indicating that it did "not oppose a stay of the execution of judgment—provided that the Sellers post a satisfactory bond" of $3.2 million. On November 14, 2023, the district court directed the Sellers to "file

either (1) a notice indicating they do not object to the bond amount proposed by the Buyer; or (2) a reply to the Buyer's response." The next day, however, rather than filing either a notice of non-objection to the bond amount or a reply, the Sellers withdrew their motion to stay.

With this factual background in mind, we conclude that the sale of the Best Peacock Inn—the subject of this litigation and the sole asset here—rendered the issue of specific performance moot.

The reason for mootness is simple: The Sellers sold the subject property to Kalonymus, which, upon closing, assigned its interest in the property to two non-party entities, and thus there is no more relief we can give the Sellers when it comes to the specific performance of the Agreement. Recall, Kalonymus initiated this action in state court to compel "specific performance of a contract to convey membership shares in a limited liability company for the purpose of conveying real property in Miami-Dade County, Florida." Kalonymus demanded that the "Sellers be required to convey [ ] 100% of the Membership Interest in [the] Best Peacock Inn pursuant to the terms of the Agreement." And that is exactly what occurred. In late November 2023, in compliance with the district court's order finding that Kalonymus was entitled to specific performance and directing the parties to close, the Sellers sold all of their shares in the Best Peacock Inn to Kalonymus's assignees. Therefore, the issue of specific performance is no longer "live," *Powell*, 395 U.S. at 496, and no further relief can be granted on the matter of the sale.

Resisting, the Sellers now argue (contrary to their position in their motion to stay) that the sale of the Best Peacock Inn did not moot the issue of specific performance, because this Court could, seemingly with ease, order the parties to "set aside" the sale. Because this Court "can, as part of its mandate, instruct the district court" to "order[ ] Kalonymus . . . to *cause the return* of the shares" of the Best Peacock Inn to the Sellers, they insist, the issue of specific performance is not moot. We reject this argument for several reasons.

First, we cannot simply un-moot the issue of specific performance here by "setting aside" the sale of the Best Peacock Inn. When the Sellers closed on the sale of the property, they accepted, in writing, that once the deal closed, 3667 Poinciana, LLC, and Poinciana, LLC, would take title to the Best Peacock Inn as assignees of Kalonymus. Under the terms of the assignment contract, which was signed by Marmol and Van Peborgh, Kalonymus "agreed to transfer all of its rights, title, and interests" in the Best Peacock Inn to the Poinciana entities: "99.5% to 3667 Poinciana, LLC, and 0.5% to Poinciana, LLC." The Poinciana entities, in turn, "agreed to accept and assume the transfer of the Membership Interests." The Sellers thus understood that, upon closing, Kalonymus would no longer have rights in the Best Peacock Inn and the Poinciana entities, both non-parties, would take title to the shares of the property moving forward.

In light of this assignment, we conclude that the issue of specific performance is moot, because "intervening events have

made it 'impossible for [us] to grant any effectual relief whatever'" to the Sellers. *See Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1287 (11th Cir. 1999) (quoting *John Roe, Inc. v. United States*, 142 F.3d 1416, 1421 (11th Cir. 1998)). There is no way for us to give the Sellers the relief they are seeking—the "transfer of the shares back to [the] Sellers"—because the property has been sold, and Kalonymus has assigned its interest in the property to third-party entities who are not parties here. *See, e.g.*, *Holloway v. United States*, 789 F.2d 1372, 1373–74 (9th Cir. 1986) ("Because the property in question has been sold and the purchaser has not been made a party to this action, we dismiss this case as moot . . . . [T]he purchaser of the property . . . is not a party to this appeal, and this court therefore cannot give any relief that would affect him or her."); *Heitmuller v. Stokes*, 256 U.S. 359, 361–62 (1921) ("As the action was brought to recover the possession of real estate, and as the defendant in error has, pending review in this court, sold it, we agree with the contention that the case has become moot . . . . [T]he defendant in error having sold and conveyed the property, a judgment, if in his favor, will not give him possession of the premises . . . . [T]his court will not decide moot cases.").

The Sellers acknowledge the transfer of the property to third parties, but they argue that 3667 Poinciana, LLC, and Poinciana, LLC, are not "bona fide purchasers," because "the Poinciana Entities took the property with knowledge of the litigation," and the district court could "join the Poinciana Entities as parties to this suit on remand." True, Kalonymus's owner Maximilian Zeff helped create the Poinciana entities "for the purpose of owning the

23-13678                 Opinion of the Court                         15

majority of Best Peacock Inn, LLC," so the Sellers are likely correct that these entities "knew of" this litigation when they took title to the property. But this fact is only part of the equation.[3] "Mootness demands that there be something about the case that remains alive,

_____

[3] Under Florida law, a buyer is considered a bona fide purchaser if "(1) the purchaser obtained legal title to the challenged property, (2) the purchaser paid the value of the challenged property, and (3) the purchaser had no knowledge of the claimed interest against the challenged property at the time of the transaction." *Harkless v. Laubhan*, 278 So. 3d 728, 733 (Fla. 2d DCA 2019). The Sellers tell us that the Poinciana entities are "not bona fide third-party purchasers because they acquired title to the shares of Best Peacock Inn with full knowledge of the litigation and the pendency of the appeal." But just because a third-party purchaser has knowledge of a lawsuit does not mean he acquired the property with knowledge of a "conflicting claim, interest, or right in the property." *Harkless*, 278 So. 3d at 733 (internal quotations omitted); *see also Miami Ctr. Ltd. P'ship v. Bank of N.Y.*, 838 F.2d 1547, 1554 (11th Cir. 1988) (holding, in the bankruptcy context, that "[k]nowledge of claims asserted in a pending appeal does not deprive a purchaser of good faith status").

Here, at the time that the Poinciana entities accepted the assignment of interests from Kalonymus, the Sellers had made clear, in signed documents, that Best Peacock Inn, LLC, had clean title to the property, free of encumbrances. Puzzlingly, the Sellers direct our attention to an email they sent just before closing, in which they proposed adding language to the closing documents that would have purportedly preserved their rights to appeal the final judgment. But the parties did not include this language in the closing documents. Instead, as we've said, the Sellers signed closing documents attesting that they were selling the property without encumbrances upon it or claims against it. The Sellers did not record a notice of *lis pendens* on the property until July 25, 2024—nearly eight months after the sale and over eight months after they initiated this appeal. Therefore, the Sellers have not demonstrated that the Poinciana entities (neither of which are parties) are anything other than bona fide purchasers for value in this case.

present, real, and immediate so that a federal court can provide redress in some palpable way." *Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 733 (11th Cir. 2018). Not only are the Poinciana entities not parties to this case, but, significantly, neither is Zeff, so we cannot say that the relief sought by the Sellers, when it comes to specific performance, presents a live, real, present, and immediate controversy for which we can provide redress in a palpable way.

On this point, the Sellers direct our attention to *Paris v. U.S. Department of Housing & Urban Development*, 713 F.2d 1341 (7th Cir. 1983), where the Seventh Circuit held that a case was not moot, in spite of a sale of real property. There, the buyer (an individual) and the seller (the government) "were [co-]defendants in th[e] proceeding below" and had "completed the sale in the knowledge that it was under legal challenge." *Id*. at 1344. "In such a situation," the court reasoned, the court still had jurisdiction over the parties who controlled the property and "thus [could] still reach the subject matter of the suit [and] compel restoration of the *status quo*." *Id*. But that case materially differs from ours. As the *Paris* court took care to mention, the subject property in that case had since been transferred from the buyer to a non-party partnership, of which the buyer was the "sole general partner." *Id*. at 1345 n.3. Thus, under Indiana law, the buyer still "ha[d] the power, in response to an order of the court, to bind [the non-party partnership] either to reconvey the property" or to enter into a contract with the seller. *Id*.

Here, by contrast, Zeff was not a party in the proceeding below; Kalonymus was. We have no evidence indicating that

Kalonymus has the power to bind the Poinciana entities to reconvey the Best Peacock Inn or to enter into a new contract with the Sellers. And even assuming that we could pierce the corporate veil to reach Zeff, Zeff does not appear to have that power either, at least according to the record evidence: While Zeff does fully own Poinciana, LLC, he testified that he has "less than 1 percent ownership interest in" 3667 Poinciana, LLC, which is the entity that was assigned 99.5 percent of Kalonymus's "rights, title, and interests" and the parties agreed would become the "Manager" of the Best Peacock Inn after the sale. Zeff testified that he has "no power to remove" 3667 Poinciana, LLC, as "Manager" of the Best Peacock Inn, and no power to appoint a new manager of the property.

Zeff also testified that 3667 Poinciana, LLC, is "99.99 percent owned by" an entity called "RDZ Family, LLC," named for the initials of Zeff's father. Zeff testified that, while he is a "beneficiary" of RDZ Family, LLC, he does not "sign[ ] for" the company. He agreed, on cross-examination, that lawyers for RDZ Family, LLC, represented his father but were "clear and specific" that they did "not represent[ ] [him]." Zeff also agreed that his "father alone had the power to appoint and remove" 3667 Poinciana, LLC, as Manager of the Best Peacock Inn.

To sum up, then, the evidence shows that the current 99.5 percent owner of the Best Peacock Inn—3667 Poinciana, LLC—is a non-party entity controlled by another non-party entity—RDZ Family, LLC—which is managed by members with no involvement here. Therefore, contrary to the Sellers' claim, and unlike in

*Paris*, we cannot simply order Kalonymus to "cause the return of the shares" of the Best Peacock Inn back to the Sellers and compel restoration of the *status quo*. The parties who now control the property are not within our jurisdictional reach. We thus reject the Sellers' contention that the sale of the property to the Poinciana entities did not moot the issue of specific performance.

This brings us to the second reason that the issue of specific performance is moot: the Sellers' decision to withdraw their motion to stay and voluntarily proceed with the transaction below. As noted above, the Sellers initially filed a motion to stay the execution of judgment, in which they expressed their willingness to comply with an order requiring a supersedeas bond, if the district court did stay the execution of the judgment pending appeal. They noted that, without a stay, conveyance of the subject property would destroy "their appellate remedies" and "moot . . . their challenge on appeal of the [district court's] Judgment granting specific performance to Kalonymus." But on November 15, 2023, having been presented with the options of assenting to the bond amount proposed by Kalonymus or filing a reply to Kalonymus's response to their motion to stay, the Sellers filed a notice of withdrawal and moved forward with the sale. They did so just twelve days after telling the district court that, "[a]bsent a stay, their appeal of the [c]ourt's Final Judgment awarding specific performance to Kalonymus *will inevitably* become moot on November 27, 2023."

The Sellers' decision to decline to post a bond, withdraw their motion to stay, and proceed with the sale of the property

evinces that the issue of specific performance is moot. This Court has held, in the bankruptcy context, that once a sale of property "is approved by the bankruptcy court and consummated by the parties," an appellate court can no longer "grant[ ] effective relief if a sale is not stayed," and thus "the failure to obtain a stay renders the appeal moot." *In re Charter Co.*, 829 F.2d 1054, 1056 (11th Cir. 1987); *see also In re Matos*, 790 F.2d 864, 865 (11th Cir. 1986) ("It is settled law in this circuit that when the debtor fails to obtain a stay pending appeal of the bankruptcy court's or the district court's order setting aside an automatic stay and allowing a creditor to foreclose on property, the subsequent foreclosure and sale of the property renders moot any appeal."). This rule of law is "premised upon considerations of finality." *In re Matos*, 790 F.2d at 865–66; *see also In re Stanford*, 17 F.4th 116, 126 (11th Cir. 2021) (Jordan, J., concurring in part and concurring in the judgment) (explaining that the aforementioned rule is premised, in part, on the need to deter "buyer's remorse").

Courts around the country have applied a similar rule to sales of real property outside the bankruptcy context. As one of our sister circuits remarked: "The general rule followed in the United States is that absent a stay, sale of the property to a good faith purchaser during the pendency of the appeal, 'moots the appeal of the judgment ordering the sale.' This rule 'applies to all judgments ordering the sale of property and is not limited to bankruptcy cases.'" *Romspen Mortg. Ltd. P'ship v. BGC Holdings LLC – Arlington Place One*, 20 F.4th 359, 367 (7th Cir. 2021) (quoting *F.D.I.C. v. Meyer*, 781 F.2d 1260, 1263–64 (7th Cir. 1986)).

In *Holloway*, for example, the petitioners appealed the district court's denial of their petition for a writ of prohibition to prevent the Internal Revenue Service from seizing and selling their property to satisfy their unpaid taxes. 789 F.2d at 1373. After the district court denied their petition, the Holloways did not seek a stay, and their property was sold. *Id.* The Ninth Circuit held that the appeal was moot. To begin with, "[t]he act or event sought to be prohibited by the Holloways was the sale of their property," and [t]hat sale has already occurred." *Id.* at 1374. The court then explained, analogizing to the bankruptcy context, that "a party seeking to avoid any impairment in its ability to realize the benefit of a successful appeal must seek to stay the progress of the proceeding by obtaining a stay or injunction pending appeal. Thus a party who chooses to appeal but who fails to obtain a stay or injunction pending appeal risks losing its ability to realize the benefit of a successful appeal." *Id.* at 1374 (quoting *In re Combined Metals Reduction Co.*, 557 F.2d 179, 188 (9th Cir. 1977) (citation modified)). The court reasoned that the Holloways "had an opportunity to prevent the sale of their property through a stay of the order denying their petition" but "failed to take advantage of that opportunity." *Id.* at 1373–74. In light of this fact, and because the property had since been sold to a non-party, the Ninth Circuit dismissed the appeal as moot. *Id.* at 1374.

Similar considerations apply here. Not only did the Sellers fail to obtain a stay pending appeal, but they voluntarily terminated their effort to obtain one *after* urging the district court to enter an order staying execution of the judgment so that they "might

meaningfully preserve their appellate remedies." The Sellers were under no illusion about what a stay would entail; they noted explicitly their willingness to post a bond or some other form of security. But when Kalonymus came back with a number, the Sellers balked. We cannot say for sure why the Sellers proceeded the way they did. But Marmol and Van Peborgh's decision to withdraw their motion to stay only confirms that the subsequent sale of the property (and the assignment to third parties beyond the reach of our equitable powers) was both voluntary and final. Under these circumstances, we conclude that the Sellers have lost their ability to realize the benefit of a successful appeal on the matter of the sale—a position they themselves advanced when they told the district court that conveyance of the subject property would moot their challenge of the court's judgment granting specific performance to Kalonymus.

For these reasons, we hold that the issue of specific performance is moot, having "lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law." *Hall v. Beals*, 396 U.S. 45, 48 (1969) (per curiam).

## B.    Damages

We turn now to the issue of damages, which "remains a live controversy." *Adler v. Duval Cnty. Sch. Bd.*, 112 F.3d 1475, 1478 (11th Cir. 1997) (instructing district court to dismiss moot claims but resolving non-moot claims on the merits); *Powell*, 395 U.S. at 497 ("Where one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case

or controversy."). The Appellants argue that the district court erred in granting Kalonymus's motion for summary judgment on its entitlement to damages and in awarding Kalonymus damages after the bench trial because Kalonymus failed to prove damages and thus failed to prove an essential element of its breach-of-contract claims. The Appellants contend that the evidence showed that individuals and entities other than Kalonymus—Zeff, Zeff's family members, and 3667 Poinciana, LLC—were the ones who might have been damaged, but that "there is no record evidence that Kalonymus [itself] suffered 'a single dime' in damages."

"We review a district court's grant of summary judgment *de novo*, applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the non-moving party." *Houston v. Williams*, 547 F.3d 1357, 1361 (11th Cir. 2008). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id*. In reviewing a grant or denial of summary judgment, we resolve all ambiguities in the non-movant's favor. *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1175 (11th Cir. 2012).

"After a bench trial, we review the district court's conclusions of law *de novo* and the district court's factual findings for clear error." *Tartell v. S. Fla. Sinus & Allergy Ctr., Inc.*, 790 F.3d 1253, 1257 (11th Cir. 2015) (citation omitted). We review a damages award for clear error and afford considerable deference to the district court. *Hiatt v. United States*, 910 F.2d 737, 742 (11th Cir. 1990). "When

determining whether a district court's damages award constituted clear error, we must be especially careful about reversing findings of fact based on the district court's evaluation of live witness testimony because the district court is better positioned to evaluate such evidence." *Superior Constr. Co., Inc. v. Brock*, 445 F.3d 1334, 1346 (11th Cir. 2006) (internal quotations omitted).

In this case, at the summary-judgment stage, there was evidence in the record that Kalonymus suffered some amount of damages stemming from the Sellers' breach. On October 28, 2021, Kalonymus's lawyers sent the Sellers a communication attesting that the "Buyer"—Kalonymus—was "suffering and continuing to incur significant losses and damages," having to "delay its financing resulting in increased transaction fees as well as substantial losses related to the terms of [the] loan, including a material increase in the interest rate," and incurring "lost rental income . . . in an amount easily calculated based upon the current rent roll," all caused by the Sellers' "breaches and misrepresentations."

Additionally, in support of its motion for summary judgment, Kalonymus included a declaration from its damages expert, Paul Habibi, who averred that the Sellers' "delay in closing occurred during one of the most turbulent periods for capital markets in decades." Habibi estimated that, if the parties had been able to close in October 2021, the value of Kalonymus's cost of capital would have been $1,830,829, a figure he came to by weighing the costs of debt and equity according to the proportion of each type of capital in the Best Peacock Inn's capital structure. Due to rapidly

rising interest rates, Habibi explained, Kalonymus's cost of capital in December 2022 was all the way up to $3,538,129, resulting in current cost-of-capital damages of $1,707,300. Habibi also estimated that Kalonymus had suffered, among other things, $98,765 in the form of "lost cash flow damages." The evidence thus supports the district court's finding, on summary judgment, that Kalonymus suffered some amount of damages greater than zero.

The Sellers also appeal the court's award of damages following the bench trial. At trial, Habibi testified that the total damages suffered by Kalonymus until that point was $2,673,742. He came to this figure by aggregating the sums of Kalonymus's cost of capital ($2,346,638), lost profits ($175,028), cost of capital for portfolio properties ($87,210),[4] duplicate expenses ($50,650), and lost tax savings ($14,217). But following Habibi's testimony, Marmol and Van Peborgh "offered to finance the credit portion of the transaction under the same terms [that] Newmark"—a loan broker—"had offered in October 2021." Habibi was then recalled as a witness, and he testified that, if the Sellers did finance the credit portion of the transaction under the original loan terms, Kalonymus's cost of capital would be $1,322,850 instead of $2,346,638, and one of the duplicate expenses (a lender counsel fee of $9,500) would have to be

---

[4] The district court ultimately declined to include the cost of capital for portfolio properties in its damages award, based on its finding that "Kalonymus did not present any evidence linking these portfolio losses, incurred by separate entities, to Kalonymus itself." Kalonymus does not contest this issue on appeal.

erased. In light of these developments, the district court found that Kalonymus had established damages resulting from the breach in the amount of $1,553,245,[5] contingent on the Sellers following through on their pledge to finance part of the transaction under the original terms Newmark had offered in October 2021.

The Sellers now contest the entire damages award for the overarching reason that entities or individuals other than Kalonymus were the ones who suffered damages resulting from the Sellers' breach. Outside of the category of lost tax advantages, which we'll return to below, we are not persuaded by the Sellers' arguments.

We begin with the cost of capital, or the combined cost of debt and cost of equity. As defined by Habibi, cost of debt is "whatever a borrower would have to pay to borrow money." This cost is derived using a "risk-free" interest rate (set by the United States Treasury) and a "risk premium" or "spread." Cost of equity, on the other hand, refers to the "expected return" for the investor providing equity capital. Habibi testified at trial that the cost of debt had nearly doubled between October 2021 and November 2023, while the cost of equity had "also skyrocketed, actually even more as a

---

[5] $1,553,245 is the sum of Kalonymus's revised cost of capital ($1,322,850), lost profits ($175,028), revised duplicate expenses ($41,150), and lost tax savings ($14,217).

percentage increase than the cost of debt," from 5.56 percent to "roughly 12 percent."

The Sellers argue that Kalonymus suffered no harm in the form of capital costs. Their reasoning is that Kalonymus never lost out on the more favorable loan terms Newmark offered in October 2021, because Kalonymus was not a party to the loan transaction. They similarly suggest that Kalonymus contributed no equity capital for the investment. As an initial matter, we note that the Sellers seem to be ignoring the fact that Kalonymus paid the Sellers a deposit of $131,000 for the property in advance of the deal closing, which the Sellers chose to keep even after they breached, on the theory that Kalonymus owed *them* damages. It is undisputed that Kalonymus itself borrowed these funds. Habibi also testified that, based on the "entire ownership structure of the investment," it was his expert opinion that Kalonymus itself suffered equity costs as an arm's-length investor. So, we reject the Sellers' assertion that Kalonymus never put capital contributions toward the Best Peacock Inn and "suffered absolutely no harm."

As to the cost of debt, it's true that, in the Newmark loan agreement, 3667 Poinciana, LLC, was listed as the entity that would be taking out the loan if the deal went through (although the loan agreement also references "Kalonymus Credit Facility" on the bottom of each page and throughout the document). But this is a red herring. At the time that the district court awarded damages to Kalonymus, no special-purpose entities had taken assignment of Kalonymus's interest in the Membership Purchase

Agreement, since that assignment was contingent on the parties closing on the sale. Thus, throughout the litigation and up until the sale of the property in November 2023, Kalonymus remained the buyer, and Kalonymus suffered the consequences of increasing interest rates. Because the increased costs associated with rising interest rates were incurred by Kalonymus, irrespective of whatever entities it planned to transfer its interests to in late 2021, we reject the Sellers' claim that the district court granted Kalonymus a "windfall" in the form of cost-of-debt damages.

Next, the Sellers argue that Kalonymus suffered no lost profits because "it was neither the landlord nor going to be an owner" of the Best Peacock Inn. However, the Sellers point us to nothing in the record showing that Kalonymus would not have earned cash flow from the property if the parties had closed in October 2021. They speculate that "distribution[s] would not have gone to Kalonymus," but they identify nothing concrete. On the other hand, Habibi testified that Kalonymus lost out on $175,028 in "cash flows from operations," explaining that "the buyer entity"—Kalonymus—"is entitled to receive those cash flows." "Under Florida law, 'evidence as to the amount of damages cannot be based on speculation or conjecture, but must be proven with certainty.'" *Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1222 (11th Cir. 2018) (quoting *Caulkins Indiantown Citrus Co. v. Nevins Fruit Co.*, 831 So. 2d 727, 734 (Fla. 4th DCA 2002)). Here, the Sellers have provided us with nothing beyond speculation to cast doubt on Habibi's or the district court's calculation of lost

profits, so we cannot say that the district court clearly erred in granting those damages.

Additionally, the Sellers argue that the district court erred when it awarded Kalonymus $41,150 in "duplicate expenses." These expenses have taken on something of a misnomer. At summary judgment, Kalonymus sought $50,650 in "administrative fees" that it argued it would be forced to spend "in order to duplicate the transaction." In other words, these damages represent the new set of administrative costs Kalonymus would have to incur in order to close on the transaction. As Habibi explained in his declaration, these expenses included a payment for a zoning report, a payment for a "property condition report," a fee for an appraisal, a fee for an "environmental site assessment," and legal fees. Regardless of who (if anyone) paid these expenses the first time around, the evidence shows that Kalonymus took on these additional costs later. The Sellers offer nothing to rebut this point. Therefore, we find no clear error in the district court's award of "duplicate expenses."

Finally, however, when it comes to lost tax advantages, we agree with the Sellers that the record evidence does not support the district court's award of damages. Habibi testified that, under the 2017 Tax Cuts and Jobs Act, bonus depreciation began to be phased out on January 21, 2023, so, in simplified terms, a party filing taxes before that date could have deducted more than a party filing after that date. But Habibi also testified that a limited liability company cannot itself take advantage of tax benefits related to asset

23-13678                 Opinion of the Court                          29

depreciation.  Rather, he explained, "[i]t's the members as individuals" who suffer the loss of tax depreciation, because individuals are the ones "filing the tax returns."  As such, even if the Sellers had never breached and the deal went through in October 2021, the tax benefits derived from a pre-phaseout closing would only have been available to the individuals filing tax returns—not Kalonymus. Therefore, the district court erred in awarding $14,217 in tax damages to Kalonymus.

### III.    CONCLUSION

For the foregoing reasons, we hold that the issue of specific performance in this case is moot.  We, therefore, **DISMISS** the appeal as to that issue.[6]

---

[6] Normally, when an issue becomes moot on appeal, we not only "dismiss as to the mooted issue, but also vacate the portion of the district court's order that addresses it." *De La Teja v. United States*, 321 F.3d 1357, 1364 (11th Cir. 2003).  We do not do so here, because the policy of vacating the underlying district court order is premised on the equitable principle that "[a] party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994); *see also United States v. Munsingwear, Inc.*, 340 U.S. 36, 39–40 (1950) (holding that vacatur of the judgment below in a case that has become moot on appeal "clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance").  An appellate court need not "vacate[ ] the unreviewed court judgment to prevent its having preclusive effect in subsequent litigation" if the equitable principles laid out by the Supreme Court are not implicated.  *Westmoreland v. Nat'l Transp. Safety Bd.*, 833 F.2d 1461, 1463 (11th Cir. 1987).  Here, it is not the "vagaries of circumstance" that prevent us from reaching the merits of the district

The district court's damages award is **AFFIRMED** in all respects except to the extent that the court awarded damages for lost tax savings, which we **REVERSE**.  Accordingly, we vacate the district court's damages award and **REMAND** for recalculation of damages consistent with this opinion.

**DISMISSED IN PART; AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

---

court's award of specific performance, but rather the Sellers' deliberate decision to comply with the district court's final judgment and forgo a stay of the execution of judgment pending appeal.  Thus, under the circumstances of this case, we conclude that the parties remain bound by the portion of the district court's final order dealing with specific performance.  *See Bancorp*, 513 U.S. at 24–25 ("[Where] the party seeking relief from the judgment below caused the mootness by voluntary action," he "voluntarily forfeit[s] his legal remedy by the ordinary processes of appeal or certiorari, thereby surrendering his claim to the equitable remedy of vacatur."); *e.g.*, *Sierra Club v. Glickman*, 156 F.3d 606, 620 (5th Cir. 1998) (declining to vacate an underlying order where an issue was rendered moot by the losing party's "voluntary compliance with the district court's judgment").